33 F.3d 600
 63 USLW 2183, 45 Soc.Sec.Rep.Ser. 406,
Medicare & Medicaid Guide P 42,613
 Randy and Diane WOOD, Individually and on behalf of their
minor son, Evan Wood, and on behalf of all others
similarly situated, Plaintiffs-Appellees,
v.
Arnold R. TOMPKINS, Director, Ohio Department of Human
Services, Defendant-Appellant.
 No. 93-3684.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 27, 1994.
Decided Aug. 29, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 18, 1994.
 
 Robert J. Gehring (argued and briefed), Law Firm of Robert J. Gehring, Cincinnati, OH, for Randy Wood.
 Brian E. Hurley (briefed), Crabbe, Brown, Jones, Potts & Schmidt, Robert J. Gehring, Law Firm of Robert J. Gehring, Cincinnati, OH, for Diane Wood.
 Alan Schwepe (argued and briefed), for Office of the Atty. Gen., Columbus, OH, for Arnold R. Tompkins.
 Before: MARTIN, JONES and BATCHELDER, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge, delivered the opinion of the court, in which BOYCE F. MARTIN, Jr., Circuit Judge, joined.
 BATCHELDER, Circuit Judge (pp. 612-14, delivered a separate dissenting opinion.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Plaintiffs-Appellees Randy and Diane Wood initiated this action on behalf of themselves, their minor son Evan, and all parents and children in the State of Ohio who have applied for admission to, or are participating in, the "Medically Fragile Waiver" program administered by Defendant-Appellant, the director of Ohio's Department of Human Services.[1] Plaintiffs claim that the director's administration of the waiver program violates various provisions of the Medicaid Act. They also allege that the director violated their substantive and procedural due process rights under both the United States and Ohio Constitutions, and under Ohio statutory law.
 
 
 2
 This is an interlocutory appeal from the denial of Defendant's motion to dismiss. The issue before us is whether Plaintiffs have a private right of action under 42 U.S.C. Sec. 1983 for the alleged Medicaid Act violations, in light of the Supreme Court's holding in Suter v. Artist M., --- U.S. ----, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). We affirm in part and reverse in part, finding that some of the relevant Medicaid Act regulations give rise to a private right of action.
 
 I.
 
 3
 Medicaid is a cooperative federal-state program through which the federal government offers financial assistance to participating states that provide medical care to needy individuals. Although participation is voluntary, states choosing to receive federal Medicaid funds must comply with the requirements of the Medicaid Act and the regulations promulgated by the Secretary of Health and Human Services (HHS). Ohio is a participating state.
 
 
 4
 Specific provisions of the Medicaid Act, 42 U.S.C. Secs. 1396a(a)(10)(A)(ii)(IV) and 1396n(c), allow participating states to apply to the Secretary of HHS for a waiver of various requirements, in order that Medicaid funds may be used to provide home and community-based health services for individuals who, but for the waiver, would require institutional care.[2] This sort of waiver saves both the state and the federal government money, because home care is often less expensive than institutional care. However, the Secretary may not waive any requirements that protect the well-being of Medicaid recipients. To the contrary, a state cannot receive a waiver unless it provides "assurances satisfactory to the Secretary" that its waiver plan includes "necessary safeguards ... to protect the health and welfare of individuals" receiving home care. 42 U.S.C. Sec. 1396n(c)(2)(A). Once a waiver is granted, the Secretary is required to monitor the implementation of the waiver programs to ensure that all of the requirements are being met, and to terminate any noncomplying waiver. Sec. 1396n(f)(1).
 
 
 5
 In 1989, Ohio applied for, and received, a waiver pursuant to Secs. 1396a(a)(10)(A)(ii)(VI) and 1396n(c), in order to provide home care to Medicaid recipients who would otherwise be institutionalized. The result is Ohio's "Medically Fragile Waiver" program.[3] See O.A.C. Secs. 5101:3-39-01 et seq., and 5101:1-39-65, 93 and 95.
 
 
 6
 Plaintiffs allege that Evan Wood, now five years old, suffers from such severe mental and physical disabilities that he requires 24 hour a day nursing assistance.[4] Since July 1990, Evan has been cared for at his parents' home. Until August 1992, a private health insurance policy paid for Evan's medical and nursing services. But on August 1, 1992, all private insurance for Evan terminated.
 
 
 7
 In anticipation of this termination, the Woods applied in February 1992 to Ohio's Department of Human Services for a Medically Fragile Waiver. On May 1, 1992, the director notified the Woods that Evan would not be entered into the waiver program for the sole reason that "they would not accept the number of hours [of skilled nursing services] approved by the program." The Woods appealed.
 
 
 8
 On July 1 and July 27, 1992, the Woods appeared at two administrative hearings. They attempted to introduce evidence showing that Evan required a minimum of 16 hours of nursing care per day, and that this level of care would cost much less than if Evan had to go to a hospital. The Woods allege, however, that the hearing officer refused to admit this evidence on the ground that the director had imposed a statewide cap, under which Evan could receive only 10 to 11 hours per day of nursing services.
 
 
 9
 The Woods allege that the statewide cap is not based on any sort of evaluation of the medical needs of the individual waiver program recipients, that it puts all of the waiver program recipients at risk, and that, as implemented, it violates several provisions of the Medicaid Act and the regulations promulgated thereunder. In particular, their complaint alleges violations "including, but not limited to the following provisions:" 42 U.S.C. Secs. 1396a(a)(3), 1396a(a)(8), 1396a(a)(10)(A)(ii), 1396a(a)(17), and 1396a(a)(19); 42 C.F.R. Secs. 431.12, 431.18, 440.230, and 441.300 et seq. They further allege that Defendant's conduct was arbitrary and unreasonable in violation of their substantive due process rights under the United States Constitution, and that the administrative hearings were a sham, violating their procedural due process rights under both the federal and state constitutions, and violating Ohio Revised Code Chapter 5111.
 
 
 10
 On July 30, 1992, Plaintiffs filed this action in the Hamilton County Court of Common Pleas. Defendant promptly removed the case to the district court. On February 1, 1993, Defendant filed a motion to dismiss, or in the alternative, for summary judgment. In this motion, Defendant's primary argument was that the relevant Medicaid provisions did not give rise to a Sec. 1983 private right of action.[5] On March 17, the court heard oral argument, and on March 31, it granted in part and denied in part Defendant's motion to dismiss.
 
 
 11
 The claims that the court dismissed are not before the panel on appeal.[6] As for the claims not dismissed, the court did not so much as mention most of the Medicaid Act provisions that, according to Plaintiffs' Amended Complaint, Defendant allegedly violated.[7] Instead, the court focussed most of its attention on provisions that Plaintiffs did not discuss in their Amended Complaint, namely 42 U.S.C. Secs. 1396n(c)(2) and 1396n(f)(1).[8] Ultimately, the court addressed only four provisions: 42 U.S.C. Secs. 1396n(c)(2) and 1396n(f)(1), and 42 C.F.R. Secs. 441.302 and 441.303(f)(1). The court held that these four provisions created one or more rights that are actionable under Sec. 1983.[9] At Defendant's request, the court certified for interlocutory appeal the question of the existence of the private right of action under Sec. 1983. On June 16, 1993, we granted Defendant's petition for interlocutory appeal.[10]
 
 II.
 
 12
 The only issue certified for interlocutory appeal is whether the relevant statutes give rise to rights that are enforceable under Sec. 1983.[11] The parties have also briefed the issues of Randy and Diane Woods' standing to bring this suit, and the court's refusal to dismiss Plaintiffs' various due process claims on the pleadings. These questions were not certified for appeal, and we decline to address them at this time.[12] Defendants have also briefed the merits of the case, but it would be premature for us to address them at this stage of the litigation.
 
 
 13
 When reviewing an interlocutory appeal arising from a district court's denial of a 12(b)(6) motion to dismiss, "the appellate court has no authority to review disputed questions of fact. Therefore, our review of the district court's decision is limited to pure questions of law." Foster Wheeler Energy Corp. v. Metropolitan Knox Solid Waste Auth., Inc., 970 F.2d 199, 202 (6th Cir.1992) (citations omitted). We review pure questions of law de novo. See, e.g., Waxman v. Luna, 881 F.2d 237, 240 (6th Cir.1989).
 
 III.
 A. Section 1983 Jurisprudence
 
 14
 42 U.S.C. Sec. 1983 provides a private cause of action for "the deprivations of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Ever since Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980), the Supreme Court has held that Sec. 1983 provides a private cause of action for violations of federal statutes as well as the Constitution. The coverage of Sec. 1983 is to be "broadly construed." Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 105, 110 S.Ct. 444, 447-48, 107 L.Ed.2d 420 (1989). The Court has recognized only two exceptions under which statutory violations are not actionable:
 
 
 15
 A plaintiff alleging a violation of a federal statute will be permitted to sue under Sec. 1983 unless (1) "the statute does not create enforceable rights, privileges, or immunities within the meaning of Sec. 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself."
 
 
 16
 Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) (quoting Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).
 
 
 17
 To determine whether the first of these two exceptions applies, the Court has developed a three part test:
 
 
 18
 (1) Was the provision in question intended to benefit the plaintiff?
 
 
 19
 (2) Does the statutory provision in question create binding obligations on the defendant governmental unit, rather than merely expressing a congressional preference? and
 
 
 20
 (3) Is the interest the plaintiff asserts specific enough to be enforced judicially, rather than being "vague and amorphous"?
 
 
 21
 Wilder, 496 U.S. at 509, 110 S.Ct. at 2517; Golden State, 493 U.S. at 106, 110 S.Ct. at 448. The plaintiff bears the burden of proving that this exception does not apply. Golden State, 493 U.S. at 106, 110 S.Ct. at 448.
 
 
 22
 As for the second of the exceptions, the only way Congress forecloses Sec. 1983 enforcement is by "providing a comprehensive enforcement mechanism for protection of a federal right." Id. Mere availability of administrative protections is not sufficient. Id. "Rather, the statutory framework must be such that allowing a plaintiff to bring a Sec. 1983 action would be inconsistent with Congress' carefully tailored scheme." Id. at 107, 110 S.Ct. at 449. "We do not lightly conclude that Congress intended to preclude reliance on Sec. 1983 as a remedy for the deprivation of a federally secured right." Id. The defendant bears the burden of proving that this exception applies. Id.
 
 
 23
 In Wilder, the Court applied this test to the Boren Amendment to the Medicaid Act, 42 U.S.C. Sec. 1396a(a)(13)(A). The Boren Amendment requires that participating states must reimburse health care providers according to rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." Sec. 1396a(a)(13)(A). The Court held that this statute did create rights that are enforceable under Sec. 1983 by health care providers. First, "[t]here can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment." 496 U.S. at 510, 110 S.Ct. at 2517-18. Second, "[t]he Boren Amendment is cast in mandatory rather than precatory terms." Id. at 512, 110 S.Ct. at 2518-19. Third, although the Amendment contained a flexible "reasonableness" standard, "the statute and regulation set out factors which a State must consider in adopting its rates," and "reasonableness" was to be measured "against the objective benchmark of an 'efficiently and economically operated facility.' " Id. at 519, 110 S.Ct. at 2523. Consequently, even though "there may be a range of reasonable rates," the obligation to set rates that are reasonable was sufficiently particularized to be judicially enforceable. Id. at 520, 110 S.Ct. at 2523. Finally, the Court found that the Medicaid Act's administrative remedy authorizing the Secretary of HHS to withhold approval of a state plan, or to cut off federal Medicaid funds, was not sufficiently comprehensive to foreclose a private right of action under Sec. 1983. Id. at 522-23, 110 S.Ct. at 2524-25.
 
 
 24
 In Suter v. Artist M., --- U.S. ----, ----, 112 S.Ct. 1360, 1363, 118 L.Ed.2d 1 (1992), the Supreme Court discussed whether a provision of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. Sec. 671(a)(15), confers a Sec. 1983 private right of action.[13] The respondents in Suter claimed that the State of Illinois violated this statute by failing to make reasonable efforts to maintain abused or neglected children in their homes, as required under the plan that Illinois submitted to the Secretary for approval. Id. at ----, 112 S.Ct. at 1368. The Court found that the statute did not define the term "reasonable efforts." Id. In contrast, the statute and regulations at issue in Wilder provided detailed factors to be used in determining whether rates were or were not "reasonable." Id. Therefore, while the statute at issue in Wilder imposed a particularized duty on the state, the "reasonable efforts" requirement in Suter imposed only an amorphous "generalized duty" on the state. Id. at ----, 112 S.Ct. at 1370.[14]
 
 
 25
 Although the Suter Court did not explicitly run through all of the parts of the Wilder/ Golden State test, the Court's holding was in complete accord with Wilder. The key to Suter's holding was that the statute's "reasonable efforts" requirement was simply too vague, and left too much to the discretion of participating states, to create an enforceable right. Id. at ----, 112 S.Ct. at 1368. Thus, the requirement could not pass muster under the third prong of the Wilder test.
 
 
 26
 Nevertheless, the Suter dissent remarked that "the Court's conclusion was plainly inconsistent with this Court's decision just two Terms ago in Wilder." Id. at ----, 112 S.Ct. at 1371 (Blackmun, J., dissenting). However, the Suter majority expressly relied on parts of Wilder, carefully distinguished other parts, did not overrule the earlier case, and is entirely consistent with it. The First, Second, Seventh, and Eighth Circuits have so ruled, and we agree with them in this regard. See, e.g., Miller by Miller v. Whitburn, 10 F.3d 1315, 1319 (7th Cir.1993) ("We have previously held that Suter ... is not the death knell of the analytic framework established in Wilder."); Marshall v. Switzer, 10 F.3d 925, 928 (2d Cir.1993); Albiston v. Maine Commissioner of Human Services, 7 F.3d 258, 263 (1st Cir.1993) ("Suter's impact on our Sec. 1983 jurisprudence is neither particularly 'far-reaching' nor 'plainly inconsistent' with prior precedent."); Arkansas Medical Society, Inc. v. Reynolds, 6 F.3d 519, 525 (8th Cir.1993) ("[A]lthough some commentators have found Suter and Wilder difficult to reconcile, we choose to synthesize the two cases by proceeding with the two-step Golden State analysis used in Wilder, bearing in mind the additional considerations mandated by Suter."); Stowell v. Ives, 976 F.2d 65, 68 (1st Cir.1992) ("[W]e think it is much too early to post epitaphs for Wilder and its kin.... [W]e believe that it is both prudent and possible to synthesize the teachings of Suter with the Court's prior precedents, [and] we examine appellants' claims under the Wilder framework as reconfigured by the neoteric principles announced in Suter.").
 
 
 27
 In the present case, the district court certified the private right of action issue for interlocutory appeal specifically "in light of the confusion generated by the Suter opinion, and the difficulty the district courts have had in reconciling that opinion with the Wilder opinion." J.A. at 413. The court did not then have the benefit of four different circuits having cleanly reconciled the two cases.
 
 
 28
 In his brief on appeal, relying on the Suter dissent, Defendant contends that Suter significantly changed the law such that the district court in the present case erred by applying the Wilder framework. Defendant's Brief at 21-22. In light of the cases cited above, and because a careful reading of Suter reveals that it is entirely consistent with Wilder, this contention is without merit.
 
 
 29
 B. The Provisions Not Discussed By the Court Below
 
 
 30
 As noted above, the court below did not consider whether 42 U.S.C. Secs. 1396a(a)(3), 1396a(a)(10)(A)(ii), and 42 C.F.R. Secs. 431.12, 440.230, and 441.300 et seq. (excluding Secs. 441.302 and 441.303(f)(1)), give rise to a private right of action under Sec. 1983. Each of these provisions was expressly raised in Plaintiff's Amended Complaint and in Defendant's Motion to Dismiss. The Supreme Court has instructed that, in determining whether a statute gives rise to a right enforceable under Sec. 1983, "each statute must be interpreted by its own terms." Suter, --- U.S. at ---- n. 8, 112 S.Ct. at 1367 n. 8. Assuming that Plaintiffs do not render the question moot by abandoning some or all of their claims, we instruct the district court on remand to apply the Wilder framework to these provisions, in order to determine whether Defendant's motion to dismiss should be granted with respect to these claims.
 
 
 31
 C. Applying the Three Part "Enforceable Rights" Test
 
 
 32
 We turn now to the provisions on which the district court did rule. The court held that 42 U.S.C. Secs. 1396n(c)(2), 1396n(f)(1), and 42 C.F.R. Secs. 441.302 and 441.303(f)(1), did give rise to one or more private rights of action pursuant to Sec. 1983. We apply the Wilder framework to each of these statutes or regulations in turn.
 
 
 33
 1. 42 U.S.C. Sec. 1396n(c)(2) and 42 C.F.R. Sec. 441.302
 
 
 34
 a.
 
 
 35
 42 U.S.C. Sec. 1396n(c)(2) and 42 C.F.R. Sec. 441.302 provide that a state must make various assurances that are satisfactory to the Secretary in order to obtain a waiver.[15] The district court held that this statute and its corresponding regulation impose binding obligations upon participating states. We agree.
 
 
 36
 First of all, although some of the assurances that a state is required to make under Section 1396n(c)(2) were obviously designed to save the government money, see, e.g., Sec. 1396n(c)(2)(D) (providing that home care costs may not exceed the cost of institutional care), other assurances serve to protect the health and welfare of home care Medicaid recipients. E.g., Sec. 1396n(c)(2)(A) (providing that a state must assure that "necessary safeguards ... have been taken to protect the health and welfare of individuals provided services under the waiver."); Sec. 441.302(a) (same); Sec. 1396n(c)(2)(B) (requiring participating states to evaluate the level of care needed by home care Medicaid recipients); Sec. 441.302(c) (same); Sec. 1396n(c)(2)(C) (providing that recipients receive information about feasible alternatives); Sec. 441.302(d) (same); Sec. 1396n(c)(2)(E) (providing that a participating state must make an annual report to the Secretary describing, inter alia, the impact of the waiver on the health and welfare of home care Medicaid recipients); Sec. 441.302(f)(2) (same).
 
 
 37
 Second, Secs. 1396n(c)(2) and 441.302 impose mandatory duties upon participating states. Such states must provide the various enumerated assurances in order to obtain a home care waiver.
 
 
 38
 Third, there is nothing vague or amorphous about what the statute or corresponding regulations require of participating states. The duties set forth therein do not involve any fuzzy, undefined concepts like "reasonable efforts."[16] Rather, these duties involve unambiguous directives that are well within the ability of the judiciary to enforce. Thus, Secs. 1396n(c)(2) and 441.302 are more like the Boren Amendment that was at issue in Wilder than they are like the statute that was at issue in Suter. See Suter, --- U.S. at ----, 112 S.Ct. at 1368 (distinguishing Wilder ).
 
 
 39
 b.
 
 
 40
 Defendant maintains that Sec. 1396n(c) "fall[s] on the Suter side of the fence." Defendant's Br. at 32. He argues that the Medicaid Act gives the Secretary an active role in overseeing the approval of a state's waiver program, and that, according to Suter, such a role prevents the relevant provision from creating any enforceable rights. This argument is based upon a misreading of Suter.
 
 
 41
 The Suter Court recognized that, with regard to the Adoption Assistance and Child Welfare Act, the Secretary was required to play an active role in overseeing state plans for reimbursing foster care payments. --- U.S. at ----, 112 S.Ct. at 1368. The Court explained that this active role "show[s] that the absence of a remedy to private plaintiffs under Sec. 1983 does not make the reasonable efforts clause a dead letter." Id. at ----, 112 S.Ct. at 1369. In the present case, Defendant apparently interprets this passage to mean that the Secretary's oversight is somehow inconsistent with a private right of action. The Suter Court was, rather, anticipating and rebutting the possible argument that its analysis rendered Congress's requirement of "reasonable efforts" entirely meaningless and unenforceable. Id. The point in Suter was that the term "reasonable efforts," as used in the Adoption Act, is too vague to create judicially enforceable rights, but not too vague to be enforced by the Secretary, who implements her own policies regarding the efforts that the states must put forth.
 
 
 42
 To make the analogous point in the present case, were we to hold that Sec. 1396n(c)(2) did not give rise to any rights that are enforceable under Sec. 1983, the section would not thereby be rendered meaningless and unenforceable, for the section gives an important oversight role to the Secretary. It does not follow, however, that administrative oversight and private enforcement are somehow incompatible. Thus, the fact that the relevant statute requires oversight by the Secretary does not place the statute on "the Suter side of the fence."
 
 
 43
 c.
 
 
 44
 Defendant also argues that Sec. 1396n(c)(2) fails to give rise to privately enforceable rights because it places the primary responsibility for compliance upon the Secretary rather than upon the participating states. For this argument, Defendant relies on Audette v. Sullivan, 19 F.3d 254 (6th Cir.1994), and Stowell v. Ives, 976 F.2d 65, 69 (1st Cir.1992). The Audette and Stowell courts found that a plaintiff has no Sec. 1983 right of action against a state for the violation of 42 U.S.C. Sec. 1396a(c)(1),[17] specifically because the statute "is essentially administrative in nature and imposes an obligation exclusively upon federal officials, not upon state actors." Audette, 19 F.3d at 257 (quoting Stowell, 976 F.2d at 70). The courts distinguished statutes that place the "onus of compliance" on the federal government from those that place the onus on participating states, and held that only the latter can give rise to a cognizable section 1983 cause of action. Id. at 256-57 (quoting Stowell, 976 F.2d at 70); see also id. at 257 ("Section 1396a(c)(1) provides incentives--not commands--to the States.") (quoting Stowell, 976 F.2d at 69).[18]
 
 
 45
 Defendant argues that the same point applies to Sec. 1396n(c)(2), that the statute imposes duties on the Secretary, not the states, regarding when the Secretary is allowed to grant a state's waiver request. We disagree. We find, rather, that Sec. 1396n(c)(2), and its corresponding regulation, Sec. 441.302, places the onus of compliance squarely upon participating states.
 
 
 46
 Defendant went awry when he failed to follow the Stowell court's guidance regarding how to determine who bears the onus of compliance. This guidance was offered in the context of the Stowell court's attempt to distinguish a key footnote in Suter. In footnote 12, the Suter Court set forth a paradigm example of a statute that imposed "precise requirements on the States aside from the submission of a plan":
 
 
 47
 For example, 42 U.S.C. Sec. 672(e) provides that "no Federal payment may be made under this part" for a child voluntarily placed in foster care for more than 180 days unless within that period there is a judicial determination that the placement is in the best interest of the child.
 
 
 48
 --- U.S. at ---- n. 12, 112 S.Ct. at 1369 n. 12. The Suter Court found that, in contrast with the "reasonable efforts" clause of Sec. 671(a)(15), which was too vague to give rise to any rights that are enforceable under Sec. 1983, the "precise requirements" of Sec. 672(e) manifested a "different" congressional intent--i.e., an intent to create private rights of action under Sec. 1983. Id.
 
 
 49
 In Stowell, the appellants attempted to argue that Sec. 1396a(c)(1) was analogous to Sec. 672(e). The court rejected this argument:
 
 
 50
 In point of fact, section 1396a(c)(1) is identical, in relevant respects, not to section 672(e) but to section 671(a)(15)--the statutory provision that the Suter Court, in footnote 12, was contrasting with 672(e). The Court deemed it noteworthy that section 671(a)(15) requires "submission of a plan to be approved by the Secretary" while section 672(e) provides that "no Federal payment may be made" unless certain conditions are met. In other words, the Suter Court distinguished between cases in which, on the one hand, a statutory provision is, in effect, a communication to a specific federal official whose approval is required prior to disbursement of federal funds (section 671(a)(15)), and cases in which, on the other hand, a statutory provision is, in effect, a communication from Congress to those States that elect to apply for earmarked funds (section 672(e)).
 
 
 51
 976 F.2d at 71 (citation omitted).
 
 
 52
 Applying this distinction to the statute at issue in the present case, it is clear that Sec. 1396n(c)(2), like Sec. 672(e), falls into the latter category; it is a communication from Congress to the participating states. The language of Sec. 1396n(c)(2)--"A waiver shall not be granted under this subsection unless the State provides [certain] assurances satisfactory to the Secretary"--is entirely analogous to that of Sec. 672(e)--"No Federal payment may be made under this part" unless certain conditions are met by the states. Thus, like Sec. 672(e), Sec. 1396n(c)(2) places the primary responsibility for compliance on the participating states rather than on the Secretary. This same point applies with equal force to Sec. 441.302, which places a similar onus of compliance on the states.[19] In contrast, Sec. 1396a(c)(1) is directed only to the Secretary and not to the states--"the Secretary shall not approve...." It follows that the holdings in Audette and Stowell do not apply to Secs. 1396n(c)(2) and 441.302.[20]
 
 
 53
 d.
 
 
 54
 In light of the foregoing, it follows that at least some of the subsections of Secs. 1396n(c)(2) and 441.302 confer rights upon home care Medicaid recipients that are enforceable under Sec. 1983. However, not every subpart of these sections does so.
 
 
 55
 For example, Secs. 1396n(c)(2)(D)[21] and 441.302(e) provide that a state may not spend more on home care than it would have spent on institutional care were the home care waiver unavailable. These provisions fail the first prong of the Wilder test; they were not intended to benefit Plaintiffs as Medicaid recipients. Rather, they were intended to save the government money by limiting the amount of Medicaid funds that a state may spend on home care.[22] Similarly, Sec. 441.302(b), which requires financial accountability for the way a participating state spends its Medicaid home and community-based care funds, was designed to benefit taxpayers in general rather than Medicaid recipients in particular.
 
 
 56
 Therefore, although we affirm the district court's holding that Secs. 1396n(c)(2) and 441.302 give rise to enforceable rights, we do so only with regard to subsections 1396n(c)(2)(A), (B), (C), and (E), and 441.302(a), (c), (d), and (f)(2). These are the subsections that, as discussed above, inure specifically to the benefit of home care Medicaid recipients.
 
 2. 42 U.S.C. Sec. 1396n(f)(1)
 
 57
 Like Sec. 1396n(c)(2), Sec. 1396n(f)(1) is another provision that Plaintiffs did not mention in their Amended Complaint, but which the court below focussed upon as creating enforceable rights. However, with respect to Sec. 1396n(f)(1), we are obliged to disagree with the district court.
 
 
 58
 Section 1396n(f)(1) provides that even after a waiver is granted, the Secretary shall continue to monitor the state's waiver program in order to assure that the requirements continue to be met, and shall terminate waivers where he finds states to be noncompliant. This statute places the onus of compliance directly upon the Secretary rather than the states. Like Sec. 1396a(c)(1), it "provides incentives--not commands--to the States." Audette, 19 F.3d at 257 (quoting Stowell, 976 F.2d at 69). Thus, as per Audette, we are bound to hold that it does not create rights enforceable against the states. We reverse the district court's holding to the contrary.
 
 3. 42 C.F.R. Sec. 441.303(f)(1)
 
 59
 This regulation provides that a state must furnish the HCFA with "[a]n explanation with supporting documentation satisfactory to HCFA of how the agency estimated the per capita expenditures for services." It further provides a detailed formula that is to be used for making these estimates. The regulation makes it clear that its purpose is to limit the amount of money that a state may receive; the costs under a waiver program "must not exceed ... the cost of services in the absence of a waiver." Sec. 441.303(f)(1). Thus, the purpose of this regulation was not to benefit Medicaid recipients. It follows that the regulation confers no enforceable rights upon such recipients. The district court erred by holding to the contrary.
 
 
 60
 D. Congressional Foreclosure of a Sec. 1983 Remedy
 
 
 61
 In Wilder, the Supreme Court held that the administrative remedies set forth in the Medicaid Act for violations under the Act "cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of Sec. 1983." 496 U.S. at 522, 110 S.Ct. at 2524. This holding is dispositive in the present case, for the remedies described in Wilder are the very same remedies set forth in the Medicaid Act for the alleged violations at issue in the present case. They are no more comprehensive now than they were in Wilder.
 
 
 62
 Defendant argues to the contrary, on the ground that the degree of the Secretary's oversight over the Boren Amendment is less than his oversight over home care waiver programs. Defendant relies upon Carelli v. Howser, 923 F.2d 1208, 1213 (6th Cir.1991), for the erroneous proposition that oversight by the Secretary is dispositive regarding the question of congressional foreclosure of a Sec. 1983 action. Defendant's Br. at 36-37. However, Defendant has misread our Carelli decision, in which we made it clear that, with regard to the statute at issue in that case, "we do not conclude that private action is foreclosed under all circumstances by the comprehensiveness of the remedial process." 923 F.2d at 1213.[23] Nothing in Carelli remotely suggests that mere oversight by the Secretary in and of itself constitutes a remedial scheme so comprehensive as to foreclose a private remedy pursuant to Sec. 1983; such a suggestion would not only be implausible, but would also be contrary to the explicit holding of Wilder.
 
 IV.
 
 63
 For the foregoing reasons, we affirm that 42 U.S.C. Secs. 1396n(c)(2)(A), (B), (C), and (E), and 42 C.F.R. Secs. 441.302(a), (c), (d), and (f)(2) each confer a Sec. 1983 private right of action upon home care Medicaid recipients. We reverse the district court's holdings that Secs. 1396n(c)(2)(D), 1396n(f)(1), and 42 C.F.R. Sec. 441.303(f)(1) confer such rights. Further, we direct the court below to consider whether 42 U.S.C. Secs. 1396a(a)(3), 1396a(a)(10)(A)(ii), and 42 C.F.R. Secs. 431.12, 440.230, and 441.300 et seq. (excluding Secs. 441.302 and 441.303(f)(1)), give rise to such rights, and we remand for further proceedings in accordance with this opinion.
 
 
 64
 BATCHELDER, Circuit Judge, dissenting.
 
 
 65
 Because I conclude that the challenged provisions of the Medicaid statute do not create rights enforceable in a private action by the Woods, I respectfully dissent.
 
 
 66
 Before addressing my main concern with the majority's holding, I must point out that I disagree with the majority's interpretation of the scope of our review on an interlocutory appeal. The majority states:
 
 
 67
 The only issue certified for interlocutory appeal is whether the relevant statutes give rise to rights that are enforceable under Sec. 1983. The parties have also briefed the issues of Randy and Diane Woods' standing to bring this suit, and the court's refusal to dismiss Plaintiffs' various due process claims on the pleadings. These questions were not certified for appeal, and we decline to address them at this time.
 
 
 68
 Slip. Op. at 604 (footnotes omitted). While this court can, if it chooses, decline to address issues of secondary relevance on an interlocutory appeal, it clearly has the power to address all the issues raised in the case below. In Easley v. Pettibone Mich. Corp., 990 F.2d 905, 912 (6th Cir.1993), this court noted: " 'we recognize that even those issues not properly certified [pursuant to Sec. 1292(b) ] are subject to our discretionary power of review ....' " (quoting Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1455 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988)). The Seventh Circuit succinctly summed up the rule governing review of interlocutory appeals in Edwardsville Natl. Bank and Trust Co. v. Marion Labs. Inc., 808 F.2d 648, 650-651 (7th Cir.1987), in which that court held:
 
 
 69
 The statute [Sec. 1292(b) ] refers to certifying an "order" for interlocutory appeal. It is not a method of certifying questions. The question is the reason for the interlocutory appeal, but the thing under review is the order. [Citations omitted]. Were things otherwise, there would be substantial risk of producing an advisory opinion.
 
 
 70
 See also Walsh v. Ford Motor Co., 807 F.2d 1000, 1002 n. 2 (D.C.Cir.1986) ("Section 1292(b) ... appeal is from an order of the district court, not from the particular question that the district court found controlling"), cert. denied, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 677 (1987) (emphasis in original). Thus, this court may address any issue raised by the parties below if it is of importance in resolving the appeal.[1]
 
 
 71
 I now come to my main concern with the majority's decision; that is, the majority's determination that the sections of the Medicaid Act relied upon by the Woods create private rights of action. I note that this is all the majority determined; that various sections of the Medicaid statute confer a Sec. 1983 private right of action upon home-care Medicaid recipients, and not that, under the provisions of the Medicaid Act upon which they rely, the Woods have stated a cause of action for which relief can be granted. While this action is an interlocutory appeal from a denial of a motion to dismiss, which is not usually appealable, the fact of the matter is that one of the main reasons for permitting interlocutory appeals is to "materially advance the ultimate termination of the litigation." 28 U.S.C. Sec. 1292(b). And, a decisive determination that the Woods have failed to state a claim upon which relief can be granted would clearly serve this purpose.
 
 
 72
 As noted in the discussion above, when this court reviews an interlocutory appeal, the entire order is open to us. In fact, were this not the case, there is a real possibility that advisory opinions would be issued; that is, opinions that only deal in the abstract with the specific question of law certified by the district court and that do not materially advance the resolution of the controversy. See Church of Scientology of Hawaii v. United States, 485 F.2d 313, 314 (9th Cir.1973) ("the court does not render advisory opinions or decide abstract propositions"); Minnesota v. United States Steel Corp., 438 F.2d 1380, 1384 (8th Cir.1971) ("The legal questions should not be considered in the abstract. There must be precision in proof of fact worthy to serve as the premises essential to balance and weigh the legal issues involved.").
 
 
 73
 I find disturbing the majority's total silence on the issue of whether the Medicaid Act grants a private right of action to these plaintiffs, the Woods, such that they have stated a claim for which relief can be granted. I would hold that it does not. By their silence, the majority appears to adopt the position that if the Medicaid Act creates any private rights of action, then the Woods should be permitted to proceed with their case regardless of whether the right they are seeking to vindicate is one that can be implied from the language of the Act. This is a position I cannot join.
 
 
 74
 In essence, what the plaintiffs seek in this case is a judicial determination that their son is not receiving the amount of home-care to which they believe he is entitled. This is the Woods' primary contention, and all of their other claims are little more than a footnote to it. It is apparently the Woods' position that they are the appropriate party to make the determination as to how much care Evan is entitled to under the waiver program. However, nothing in the language of the relevant provisions of the Medicaid Act supports this position. What the language of the Act does specifically provide is that
 
 
 75
 [t]he Secretary may by waiver provide that a State plan approved under this subchapter may include as 'medical assistance' under such plan payment for part or all of the cost of home or community-based services ... approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing or intermediate care facility....
 
 
 76
 42 U.S.C. Sec. 1396n(c)(1) (emphasis added).
 
 
 77
 The language of this section specifically permits the state to provide for part or all of the cost of home or community-based services; I find no provision of the code or regulations that requires the state to defer to the demands of the particular recipient in determining how much care the state will provide pursuant to the plan. Any other reading renders the "part or all" language of the statute nugatory, as it is a fair bet that every potential recipient of the waiver program who does not receive the number of hours of home-based care to which she feels entitled will bring a private suit to compel the state to comply with her demands.
 
 
 78
 I do not take issue with the majority's analysis of the Suter decision, or their determination that Suter can be harmonized with Wilder. I do however disagree about the side of the Wilder/ Suter fence on which the claims made by the plaintiffs fall. It seems to me that, simply put, the issue in this case is whether the Woods can state a claim under the relevant provisions of the Act which would allow them to compel the state to provide a greater number of hours of home-care. In Suter v. Artist M., --- U.S. ----, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court determined that provisions of the Adoption Assistance and Child Welfare Act do not create privately enforceable rights. The Suter court noted that the Adoption Act mandated that "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary." The Court held the effect of this language was that "the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features." Suter, --- U.S. at ----, 112 S.Ct. at 1367. Similarly, in the case before us now, 42 U.S.C. Sec. 1396n(c)(2) reads: "A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that" various safeguards are provided and assurances are made. (Emphasis added). I concede that if the state had made no assurances whatsoever to the Secretary, a hypothetical plaintiff would have the right to file suit to force the state to make such assurances. However, once such assurances are made, it is the Secretary's duty, and not the right of a private party, to determine whether the assurances and safeguards are adequate. It seems to me that the "assurances" that the state must provide are no less fuzzy or amorphous than the "reasonable efforts" held not to create a private right of action in Suter.
 
 
 79
 In short, I would hold that the provisions of the Medicaid statute relied upon by the Woods do not, under these facts, create a claim for which relief can be granted. I would reverse the district court and remand with instructions to dismiss for failure to state a claim for which relief can be granted.
 
 
 
 [1]
 Currently Defendant-Appellant Arnold R. Tompkins is the director. At the time the suit was filed, Terry A. Wallace was the director
 
 
 [2]
 Section 1396n(c)(1) provides in pertinent part:
 The Secretary [of Health and Human Services] may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.
 Section 1396a(a)(10)(A)(ii)(VI), in turn, grants authority to participating states to create plans that could qualify for the waiver described in Sec. 1396n(c)(1).
 
 
 [3]
 This program was previously called the "Waiver V" program
 
 
 [4]
 The Woods' complaint alleges that Evan suffers from Static Encephalopathy, is nearly blind, has mental and physical development disorders, has had a tracheostomy, and requires a ventilator
 
 
 [5]
 Defendant also argued that Randy and Diane Wood lack standing to bring this suit insofar as they are not themselves Medicaid beneficiaries, and that Plaintiffs failed to state cognizable claims for due process violations
 
 
 [6]
 The court held that: Plaintiffs' claims under Secs. 1396a(a)(8) and 1396a(a)(19) were barred under Cook v. Hairston, No. 90-3437, Slip Op. at 9-11, 1991 WL 253302 (6th Cir. Nov. 26, 1991) (holding that no Sec. 1983 private right of action existed to remedy the violation of these statutes, which express mere "general policy goals" rather than specific guidelines); and Plaintiffs' claims under Sec. 1396a(a)(17) and 42 C.F.R. Sec. 431.18 were barred in light of recent amendments to pertinent state regulations. J.A. at 411-12. Still surviving, then, are Plaintiffs' claims that Defendant violated 42 U.S.C. Secs. 1396a(a)(3), 1396a(a)(10)(A)(ii), and 42 C.F.R. Secs. 431.12, 440.230, and 441.300 et seq
 
 
 [7]
 Of the surviving claims enumerated in note 6, supra, the only alleged statutory violations addressed by the court were Secs. 441.302 and 441.303(f)(1), which the court found did give rise to a Sec. 1983 private right of action
 
 
 [8]
 Apparently, it was Defendant who brought Secs. 1396n(c) and 1396n(f)(1) to the attention of the court. In his motion to dismiss, he insisted, without explanation or citation to authority, that Sec. 1396n(c) "must be read together" with Sec. 1396a(a)(10)(A)(ii). J.A. at 66 n. 12 (Defendant's Memorandum in Support of Motion to Dismiss). He repeats this bald assertion in his brief on appeal. Defendant's Br. at 32 n. 10. Similarly, Defendant pointed out in his motion to dismiss that Sec. 1396n(f)(1) provides that the Secretary is to continue to oversee the waiver program of a participating state even after he grants the state's waiver request. J.A. at 63
 
 
 [9]
 The district court's ruling is ambiguous as to whether these provisions created a series of enforceable "rights," see J.A. at 403, or whether they together created "a [single] right enforceable under section 1983," J.A. at 410 (emphasis added)
 The court also held: that it would be premature to dismiss Plaintiffs' various due process claims, which rest on fact-specific assertions, at this early stage in the litigation, before the parties had even commenced discovery; and that, because Medicaid was intended to benefit families as a whole, Randy and Diane Wood had standing to bring the suit. J.A. at 411-13.
 
 
 [10]
 During the course of this proceeding, Defendant is voluntarily providing to Evan the higher level of services that Plaintiffs seek
 
 
 [11]
 On interlocutory appeal, Plaintiffs have not abandoned their claims regarding provisions that the district court did not discuss, noted supra at notes 6 and 7. To the contrary, Plaintiffs made a point of re-alleging that Defendant violated the "specific sections of the Medicaid Act and regulations" that are set forth in their Amended Complaint. Plaintiffs' Brief at 13
 
 
 [12]
 It is worth noting, however, that regardless of whether Randy and Diane Wood have standing to bring this suit individually, there does not appear to be any dispute that they have standing to bring this suit on behalf of their minor son, Evan. Defendant does not contest Evan Wood's standing as a Medicaid recipient
 
 
 [13]
 42 U.S.C. Secs. 670, 671 provide that, in order for a state to be reimbursed for a percentage of foster care and adoption assistance payments, a state must have a plan approved by the Secretary of HHS. Section 671(a) listed 17 features that such a plan must have. Subsection (15) required that the state plan must provide that "reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home ...." Sec. 671(a)(15)
 
 
 [14]
 It is worth noting that the Court found that Sec. 671(a) did place a mandatory and particularized requirement on participating states to submit a plan to the Secretary containing the listed features. Id. --- U.S. at ----, 112 S.Ct. at 1367. However, the respondents were not claiming that Illinois violated this particular requirement, so the fact that they had this enforceable right was irrelevant. Id. Similarly, the Court noted that other sections of the Adoption Act, in contrast to Sec. 671(a)(15), did indeed impose precise requirements on the states in addition to requiring the mere submission of a plan. Id. at 1369 n. 12. This shows that the Court's holding was not intended to drastically change the Wilder standard, nor to radically limit the scope of Sec. 1983. Rather, the holding is simply that the one particular provision that was at issue is too amorphous to confer enforceable rights
 
 
 [15]
 In pertinent part, Sec. 1396n(c)(2) provides:
 A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that--
 (A) necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services;
 (B) the State will provide, with respect to individuals who [qualify], for an evaluation of the need for inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded;
 (C) such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded;
 (D) under such waiver the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted; and
 (E) the State will provide to the Secretary annually, consistent with a data collection plan designed by the Secretary, information on the impact of the waiver granted under this subsection on the type and amount of medical assistance provided under the State plan and on the health and welfare of recipients.
 In pertinent part, Sec. 441.302 provides:
 HCFA [Health Care Financing Administration of the Department of Health and Human Services] will not grant a waiver under this subpart and may terminate a waiver unless the Medicaid agency provides the following satisfactory assurances to HCFA:
 (a) Health and Welfare--Assurance that necessary safeguards have been taken to protect the health and welfare of the recipients of the services. Those safeguards must include--
 (1) Adequate standards for all types of providers that provide services under the waiver;
 (2) Assurance that the standards of any State licensure or certification requirements are met for services or for individuals furnishing services that are provided under the waiver; and
 (3) Assurance that all facilities covered by section 1616(e) of the Act, in which home and community-based services will be provided, are in compliance with applicable State standards that meet the requirements of 45 CFR Part 1397 for board and care facilities.
 (b) Financial accountability.--The agency will assure financial accountability for funds expended for home and community-based services....
 (c) Evaluation of need.--Assurance that the agency will provide for an evaluation (and periodic reevaluations) of the need for the level of care provided [by an institution], when there is a reasonable indication that individuals might need such services in the near future but for the availability of home and community-based services.
 (d) Alternatives.--Assurance that when a recipient is determined to be likely to require the level of care provided in an [institution], the recipient or his or her legal representative will be--
 (1) Informed of any feasible alternatives available under the waiver; and
 (2) Given the choice of either institutional or home and community-based services.
 (e) Expenditures.--Assurance that [home and community-based care will not be more expensive than institutional care would have been but for the waiver program].
 (f) Reporting.--Assurance that annually, the agency will provide HCFA with information on .... the waiver's impact on--
 (1) The type, amount, and cost of services provided under the State plan; and
 (2) The health and welfare of recipients.
 
 
 [16]
 It is worth noting that the enforceable rights in question are not merely procedural rights that the state's plan make the relevant provisions. Rather, the rights that are enforceable include the substantive right that the state actually act in accordance with its plan; it must implement that which it assures. The Wilder Court made this point clear when it rejected an argument that the Boren Amendment's requirements were merely procedural:
 Any argument that the requirements of findings and assurances [that reimbursements to health care providers be reasonable and adequate] are procedural requirements only and do not require the State to adopt rates that are actually reasonable and adequate is nothing more than an argument that the State's findings and assurances need not be correct.
 We reject that argument because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless. It would make little sense for Congress to require a State to make findings without requiring those findings to be correct.
 496 U.S. at 513-14. Analogously, as regards Sec. 1396n(c)(2)(A), it would make little sense for Congress to require a participating state to assure in its Medicaid plan that it will protect the health and welfare of home care recipients, without also requiring that the state actually implement the promised safeguards.
 
 
 [17]
 Section 1396a(c)(1) provides that "the Secretary shall not approve any State plan for medical assistance if the State has in effect [AFDC] payment levels that are less than the payment levels in effect under such plan on May 1, 1988."
 
 
 [18]
 We are, of course, bound by the Audette decision. Salmi v. Secretary of Health and Human Services, 774 F.2d 685, 689 (6th Cir.1985) (a panel is bound by the decisions of another panel of this court). Were we not, we would prefer to avoid the seemingly artificial distinction created by the First Circuit's Stowell opinion between statutes that place the "onus of compliance" directly upon the Secretary and those that place a direct obligation on the states. According to the Stowell court:
 In Suter, the Court held that an intended recipient of programmatic benefits could not sue under section 1983 if the federal statute merely required that the State submit a plan to a federal agency satisfying certain criteria, because such a "requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains [the listed criteria]." Suter, --- U.S. at ----, 112 S.Ct. at 1367. Thus, Suter instructs that, when a provision in a statute fails to impose a direct obligation on the States, instead placing the onus of compliance with the statute's substantive provisions on the federal government, no cause of action cognizable under section 1983 can flourish.
 976 F.2d at 69-70. A careful review of Suter, however, makes clear that an intended recipient can indeed sue under Sec. 1983 to enforce the mandatory requirement that the participating state have "a plan approved by the Secretary which contains the 16 listed features." --- U.S. at ----, 112 S.Ct. at 1367. Because the respondents in Suter agreed that Illinois complied with this requirement, they had no desire to pursue this particular claim.
 Instead, the Suter respondents were attempting to enforce the "reasonable efforts" provision in the Act, just one of the specific features of the requisite Illinois plan. Suter, --- U.S. at ----, 112 S.Ct. at 1370. The Court initially noted that the Wright and Wilder opinions "took pains to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question created 'enforceable rights, privileges, or immunities within the meaning of Sec. 1983.' " Id. --- U.S. at ----, 112 S.Ct. at 1367. Accordingly, the Court reviewed the Act in detail, finally concluding that, given the legislation's lack of specificity, the "reasonable efforts" language was too ambiguous to create a right enforceable by Sec. 1983. Id. --- U.S. at ----, 112 S.Ct. at 1370. At no point did the Court undertake an "onus of compliance" analysis. Thus, under Suter, what is relevant is not whether a defendant bears a direct or indirect "onus of compliance," but rather whether the statute at issue imposes mandatory and particularized obligations upon that defendant, thereby benefiting the plaintiff.
 As Suter "counsels that each statute must be interpreted by its own terms," id. --- U.S. at ---- n. 8, 112 S.Ct. at 1367 n. 8, it seems inappropriate to rest this court's Sec. 1983 inquiry solely on whether the statute in question initially bids the Secretary to act or instead directly commands a participating state to act. Were we not bound by the Audette court's embracement of Stowell, this panel would decline to adopt such an impermissibly truncated mode of analysis.
 
 
 [19]
 It makes no difference that, grammatically, the subject of the first sentence in Sec. 441.302 is "HCFA": ("HCFA will not grant a waiver under this subpart and may terminate a waiver unless the [state] Medicaid agency provides the following satisfactory assurances to HCFA...."). The distinction set forth in Stowell does not turn upon the simple grammatical difference between the express use of a specific subject versus the use of the passive voice. Rather, the distinction in Stowell turns upon whether a given statute or regulation is directed to a federal agency or to the states. In the case of Sec. 441.302, HCFA was the administrative agency that promulgated these regulations, and it is describing what it "will" do, rather than prescribing or mandating what it must do, or what it is permitted to do. It would make no sense at all to interpret the agency as directing its message to itself; rather the regulation is a communication from the agency to the states, in order to inform the states about what they need to do, first to receive a waiver, and then to continue operating a waiver program
 
 
 [20]
 By applying Stowell's distinction to the present case, we are not thereby endorsing the First Circuit's reading of Suter. See supra note 18. Nevertheless, given that the Stowell court misunderstood Suter as turning upon the directness of the "onus of compliance," rather than upon the vagueness inherent in the term "reasonable efforts," the Stowell court's distinction--between statutes that place the onus directly upon the Secretary, and those that place it directly upon the states--becomes inevitable
 
 
 [21]
 This is the subsection upon which the district court focussed most of its attention
 
 
 [22]
 Moreover, Plaintiffs contend that home care for Evan costs less than institutional care, so they cannot consistently contend that Defendant violated Secs. 1396n(c)(2)(D) and 441.302(e) in the present case
 
 
 [23]
 Rather, our holding was simply that the Carelli plaintiffs, in particular, failed to state a cognizable claim because they made "no attack on the applicable regulations," and alleged "no acts of non-compliance beyond those already unearthed" by the Secretary. Id. at 1215-16. All that they sought was "a 'hurry up' order from the federal court" to the state that "would address all the shortcomings the Secretary has already ordered corrected." Id. The dismissal of the Carelli suit was, then, "akin to an abstention order, although we do not label it as such." Id. at 1216
 
 
 [1]
 This principle can have no better illustration than the majority's declining to address the issue of standing. It is hornbook law that
 Standing is a threshold inquiry that a court must consider prior to addressing the merits of an appeal. T.H.E. Ins. Co. v. Naghtin, 916 F.2d 1082, 1085 (6th Cir.1990); Jaimes v. Toledo Metropolitan Housing Auth., 758 F.2d 1086, 1092 (6th Cir.1985) ("Even if no party to this appeal has raised the issue of standing, this court can and must address the issue on its own motion"). Article III of the United States Constitution requires that federal jurisdiction be limited to "cases" or "controversies." One aspect of that limitation is standing....
 United States v. Van, 931 F.2d 384, 387 (6th Cir.1991). Therefore, this court not only can, but must address the issue of standing on an interlocutory appeal. It would make little sense to address only the specific question certified for appeal if the litigants lacked standing in the first instance. In this case, the defendants assert that the plaintiffs lack standing. The district court rejected this claim and found that the Woods do have standing. The resolution of this issue requires a more direct determination than that provided in footnote 12 of the majority's opinion. Having said this, I note that if the Act did in fact provide a cause of action to the Woods, I would have no disagreement with the district court's holding that the Woods have standing to bring this action on behalf of their son Evan.