**Richard MARKVA, Deanna Markva, Beverly Langsdon, and Peggy Otler, on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**James K. HAVEMAN, Jr., in his official capacity as Director, Michigan Department of Mental Health, and Douglas E. Howard, in his official capacity as Director, Michigan Family Independence Agency, Defendants.**

No. 00–CV–10437–BC.

United States District Court, E.D. Michigan, Northern Division.

Oct. 11, 2001.

---

**2.** Count V is improperly designated "Count IV" in the amended complaint.

Terri L. Stangl, Jacqueline Doig, Saginaw, MI, for plaintiffs.

William R. Morris, Michigan Department of Attorney General, Social Services Division, Lansing, MI, for defendants.

### OPINION AND ORDER GRANTING SUMMARY JUDGMENT FOR PLAINTIFFS, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND FIRST MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, established the federal Medicaid program which is intended to provide financial assistance to needy individuals seeking medical care and treatment. The legislation creates a cooperative program in which participating states receive federal assistance to administer their individual plans under federally-established rules. A participating state's

plan must, however, comport with the requirements of the Social Security Act and the regulations promulgated by the Secretary of Health and Human Services. 42 U.S.C. §§ 1396, 1396a, 42 C.F.R. § 435.10. Federal law requires each state to designate a state agency to administer the program. 42 U.S.C. § 1396a(a)(5). Michigan has created the Family Independence Agency for this purpose.

The plaintiffs in this case are recipients or potential recipients of Medicaid funds who have brought suit for themselves and others similarly situated against state officials pursuant to 42 U.S.C. § 1983, alleging a violation of rights established under the laws of the United States regulating the state's Medicaid plan. Under the State of Michigan's plan, certain needy individuals must incur a specific amount of monthly out-of-pocket expenses for medical care before they are eligible to receive Medicaid payments. This personal expense figure is referred to as the "spend down" amount, and it is calculated by a formula based on household income. The spend down formula allows certain exclusions from income for the needs of the individual Medicaid applicant and certain other specifically-described household residents. A greater number of exclusions results in a lower net household income, and thus a lower spend down amount.

In this case, the plaintiffs are caring for their grandchildren within their household. Although the state's plan would allow parents to exclude from household income an amount allocated to the care of a resident minor child, it does not allow grandparents to claim that exclusion. The plaintiffs claim that the state's distinction between parent caretakers who are allowed this exclusion, and non-parent caretakers who are nonetheless relatives of the children in their care but are denied the exclusion, violates the federal statutes and regulations governing the state's Medicaid plan.

The plaintiffs seek an injunction that compels the state directors of the Department of Community Mental Health and the Family Independence Agency (which administer the state Medicaid plan) to allow resident relative caretakers to claim the exclusion for dependent children and adjust the spend down amount downward. The defendants have filed a motion to dismiss or in the alternative for summary judgment seeking dismissal of the complaint.

The Court heard oral argument of the parties on their respective motions on March 8 and March 14, 2001. Since that time, the plaintiffs have filed an amended complaint and a corrected amended complaint, and the defendants have filed a second motion for summary judgment, to which the plaintiffs have responded. Thereafter, the plaintiffs filed a second amended complaint by leave granted in accordance with the parties' stipulation. The Court has also determined that the matter should proceed as a class action based on the parties' stipulation and has certified the class in an order entered on October 10, 2001. The Court now finds that the state plan's distinction between parent caretakers and non-parent relative caretakers in calculating a Medicaid recipient's spend down amount violates the federal statutes and regulations governing the administration of the state Medicaid plan. The Court, therefore, will grant summary judgment in favor of the plaintiffs and order permanent injunctive relief, deny in part the defendants' motion to dismiss, and deny the defendants' first and second motions for summary judgment.

I.

Plaintiffs Richard and Deanna Markva are grandparents acting as sole caretakers of their seven-year-old grandson, Matthew Markva, Jr., who has resided with them

since he was two months old. Richard and Deanna Markva are married; Richard is Matthew Markva's sole legal guardian under a May 16, 1994 order by the Isabella County Probate Court. Richard is on disability leave from his employment due to recurring health problems for which he has been prescribed several medications costing approximately $460 per month. He receives approximately $823 per month through his employee disability coverage. Deanna Markva was employed as a janitor and received $329 per month. She also has health problems and as a former cancer patient she uses prescription drugs costing approximately $25 per month. At the time of the motion hearing, Ms. Markva had left her employment to care for Richard and Matthew. In addition, Matthew Markva receives $137 per month in cash assistance on his own application.

Plaintiff, Beverly Langsdon, is raising her 14 year old grandson, Christopher. She receives $1,009 per month in Social Security disability benefits and Christopher receives $330 per month in Social Security survivors benefits. Ms. Langsdon recently was approved to receive $10 per month in Food Stamps.

The fourth plaintiff, Peggy Otler, was added by Second Amended Complaint which was filed on September 28, 2001 pursuant to stipulation of the parties and order granting leave. Ms. Otler resides with her husband, Jerome Otler, in Genesee County, Michigan. Ms. Otler also lives with three grandchildren who are her wards: Jalen Cook, an eight-year old boy whose parents do not live with or support him; Venesia Crayton, a five-year old girl whose parents do not live with or support her; and Charles Williams, a one-year old boy whose parents do not live with him, although he receives $15 per month in child's Social Security benefits on his father's account. The Otlers' two youngest children, Jerome Otler, II and Ikeya Otler,

also live with them in Genesee County. Although both Ms. Otler and her husband are not employed, they receive income from various public welfare programs. For instance, Jerome Otler receives $776 per month in Veterans Administration (VA) benefits for total disability, and $172 per month in housebound VA benefits. Peggy Otler receives $240 in spouse's VA benefits. Jerome Otler, II receives $132 dependent's VA benefits. Ikeya Otler also receives $132 in dependent's VA benefits. Venesia Crayton, Jalen Cook, and Charles Williams receive $396 in Family Independence Program (FIP) benefits. Charles Williams receives $15 in dependent's Social Security benefits.

The Otler household's total combined income is $1863 per month or $22,356 per year for their household of 7 persons. The Otlers also receive about $223 per month in Food Stamps. Peggy Otler suffers from several severe medical conditions for which she requires ongoing treatment, including uncontrolled hypertension, asthma, and severe back and joint pain that recently was diagnosed as secondary to lupus.

Defendant, James Haveman, is the Director of the Michigan Department of Community Health (MDCH), which is responsible for administration of the federal and state jointly funded Medicaid program. Defendant, Douglas Howard, is the Director of the Michigan Family Independence Agency (MFIA), which is responsible for administration of public assistance programs at local levels including making determinations of whether applicants meet the eligibility requirements of Medicaid.

Michigan has authorized its participation in the federal Medicaid program through Mich. Comp. Laws §§ 400.105, et seq. The United States Department of Health and Human Services (HHS) oversees the state's administration of Medicaid benefits to ensure that the state is in compliance

with federal law and thus should receive matching federal funds. *See Harris v. McRea,* 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

In August 2000, the Markvas applied for Medicaid benefits for themselves through the Saginaw County FIA. They were approved for their Medicaid benefits in October 2000, with eligibility to begin January 1, 2001. Using a formula that was adopted in 1999 for establishing eligibility for assistance, the FIA determined that in order to receive benefits, Mr. and Mrs. Markva would be required to pay a $306 monthly spend down amount prior to monthly activation of Medicaid coverage. In calculating the spend down, the FIA assumed that the Markvas' income was limited to Richard's disability pay (because Deanna had quit her job to care for her disabled husband and their grandchild) and that such pay was used to support only Richard and Deanna Markva. Furthermore, FIA's determination was based on the assumption that both Richard and Deanna Markva qualified as non-parent caretaker relatives. The FIA did not, however, exclude from household income any amount allocated for the monthly care of Matthew.

The FIA arrived at the $306 figure by first referring to a Michigan Department of Social Services manual which establishes that individuals within the plaintiffs' county's "shelter area" are assigned a "protected income level" of $516 based on a family of two. Richard Markva's "countable" income, or $823 per month from disability benefits, was then divided into shares. Richard Markva, as primary beneficiary of that income, automatically was assigned 2.9 shares. Each additional eligible individual was assigned 1 share; therefore, Deanna Markva was assigned 1 share. The shares were then totaled and divided into the income. The resulting figures are as follows: $823 / 3.9 shares = $211 per share; $211 × 3.9 shares = $822

(budgeted income); $822—$516 (protected income level) = $306 (spend down).

Plaintiffs disagree with the manner in which their benefit eligibility and amount was calculated. They argue that another share should be added to the equation to reflect the income that is needed to care for Matthew. By adding another share into the equation, i.e., for the plaintiff's grandchild, 3.9 shares would rise to 4.9 shares and the resulting spend down would be reduced to $143. The plaintiffs contend that as grandparents, they fall within the same aid category as parents of dependent children for the purpose of determining their eligibility for Medicaid benefits. The Markvas argue that certain federal Medicaid statutes and regulations require the FIA to apply to them the same rules that are used to calculate benefits for parents of dependent children.

There have been other developments in the Markvas' financial circumstances since the complaint has been filed, some of which have affected their Medicaid eligibility and benefit amount. In January, Deanna Markva returned to work because public assistance was not providing sufficient benefits for her to stay at home. As a result, the FIA recalculated the Markvas' spend down amount to reflect this change in economic circumstances. An additional $531 from Deanna's employment was added to the Total Anticipated Household Income, resulting in an increase in the spend down to $836 per month. Their case worker informed them, however, that the Markvas' unpaid medical bills would be applied to the spend down as a type of "debt credit," such that the spend down amounts would be subtracted from the Markvas' outstanding medical bills each month until those debts had all been applied.

A larger spend down amount resulted in larger deductions of "debt credit" from the

Markvas' unpaid hospital bills, which in turn meant that the Markvas would have to start applying real money toward their spend down amounts sooner than if their spend down was less. By treating the Markvas the same as "parent caretakers," the spend down amount would have been $556 because of the additional share added to the proration formula to account for their grandson, Matthew.

Ms. Langsdon applied for Medicaid benefits for herself in March 2001. At the time the first amended complaint was filed adding her as a plaintiff, she had not been receiving Medicaid, but had received preliminary advice from the FIA that her application would be approved at the spend down amount of $598. If Ms. Langsdon were a parent caretaker rather than a non-parent caretaker, her spend down would be only $357 because her income proration would include an additional share for her grandson who is living in her household.

Peggy Otler originally applied for Medicaid in January 2001, and the FIA assigned the her a monthly Medicaid spend down of $418 effective February 2001. Around August 2001, the FIA re-budgeted Mr. and Ms. Otler's spend down and determined that it should be $125 per month. This spend down amount was calculated without regard for the Otlers' grandchildren. If the needs of the grandchildren would have been taken into account, Peggy Otler allegedly would not have been subject to a spend down requirement. Peggy Otler claims that she has been going without medical treatment because she does not have $125 to dedicate to medical care each month.

The Markvas filed a verified class action complaint and motion for preliminary injunction on November 22, 2000 requesting declaratory and injunctive relief to compel the FIA to award comparable benefits to all individuals within the "Caretaker Rela-

tive Medicaid" eligibility group. Caretaker relatives are those relatives "with whom any dependent child is living." 42 U.S.C. 606(b)(1)(1995). *See also* 42 U.S.C. § 1396(a)(ii). A dependent child is

> a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home (other than absence occasioned solely by reason of the performance of active duty in the uniformed services of the United States), or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of 18. . . .

42 U.S.C. § 606(a).

The Markvas assert that their grandson is a dependent child having resided in their home since he was two months old due to his parents' continued absence from the home. The FIA classifies caretaker relative applicants as "medically needy" (also known in Michigan as "Group 2" Medicaid applicants), "or categorically needy." "Categorically needy" is the group defined as aged, blind, and disabled individuals, families, and children with income low enough to qualify them for grants of cash assistance under the supplemental security income (SSI) or Aid to Families with Dependent Children (AFDC) programs. "Medically needy" is defined as aged, blind and disabled individuals, and families and children with a level of income that is too low to cover the costs of medical care, but too high to qualify them for grants under the SSI or AFDC programs. *See Calkins v. Blum,* 511 F.Supp. 1073, 1079 (N.D.N.Y. 1981). Plaintiffs assert that, based on their available income, they qualify as

medically needy non-parent caretaker relatives.

The complaint is based on 42 U.S.C. § 1983 and asks this Court to enjoin the defendants from violating the plaintiffs' federal statutory rights by unlawfully applying different methodologies to individuals similarly situated in the medically needy caretaker relative Medicaid group. Both parent and non-parent relatives, they assert, are "caretaker relatives" and should therefore have comparable methodologies applied when benefit eligibility is calculated. The plaintiffs allege that the state awards greater benefits to parents by not including in the benefit eligibility formula that money expended to support their children. The money is deemed "available" to the children and "not available" to the parents. Consequently, parental income is adjusted downward, their "protected income level" proportionately rises, their spend downs are lowered, and access to benefits is thereby increased. Caretaker grandparents, plaintiffs contend, should be treated the same way.

It is the FIA's position that Richard and Deanna Markva, and presumably Ms. Langsdon and Ms. Otler, have no *legal* obligation to support their grandchildren, and therefore their circumstances are not comparable to that of traditional family unit in which the caretakers of the minor children are their biological or adoptive parents. Consequently, the FIA believes that applying different methodologies for each group to calculate Medicaid eligibility and amount of benefits is permissible. Further, the defendants point out that Matthew Markva is receiving public assistance in his own right of $137 per month plus food stamps. Matthew's eligibility for assistance, and that of the other grandchildren, is likewise based on an income formula, but the defendants observe that they are prohibited by federal statute and regulation from including Richard and Deanna's income in that formula since their income cannot be attributed to Matthew. *See* 42 U.S.C. § 1396a(a)(17)(D), 42 C.F.R. § 435.60(a)(1). The defendants argue that since the grandparents' income cannot be deemed that of the grandchild, the reverse must also be true, i.e., that the expenses incurred by the grandparents to care for the grandchild cannot be used as an exclusion from their income when calculating the grandparents' Medicaid eligibility and benefit amount.

In response to the plaintiffs' complaint, the defendants filed a motion to dismiss, or in the alternative for summary judgment. Thereafter, the plaintiffs filed a first amended complaint (followed by a corrected first amended complaint) in which they added Ms. Langsdon as a plaintiff. The Second Amended Complaint adding Ms. Otler as a party plaintiff was filed September 27, 2001.

On April 30, 2001, defendants filed a second motion for summary judgment which raises three grounds for dismissal. First, defendants claim that the Markvas no longer have standing to sue because the money which they claim to have lost due to paying a larger spend down amount before monthly Medicaid benefits are triggered has been furnished through another public assistance program which grants Matthew monthly payments equal to or greater than Richard and Deanna's claimed shortfall, and these plaintiffs therefore are no longer "damaged." Second, the claim of the added plaintiff, Beverly Langsdon, is not ripe because she never submitted a formal application for Medicaid benefits; rather she only received a tentative denial of benefits based on a spend down formula which did not account for money expended for the care of her grandson. For its third ground for dismissal, the defendants assert that plaintiffs' claim is barred by the holdings stated in *Westside Mothers, Inc. v.*

*Haveman,* 133 F.Supp.2d 549 (E.D.Mich. 2001). In that case, another judge of this district held, in a ponderous opinion, that private persons cannot sue state administrators charged with managing joint federal-state Medicaid programs because there is no viable cause of action under 42 U.S.C. § 1983, and the administrators are immune from suit under the state's Eleventh Amendment immunity.

The plaintiffs responded to the second motion with, *inter alia,* declarations showing plaintiff Langsdon's actual application for benefits, and contending that the Markvas are suffering a continuing harm resulting from the inappropriately high spend down amounts calculated by the defendants. As for the impact of *Westside Mothers,* the parties have presented a stipulation in which the defendants have disavowed reliance on any grounds for relief stated in that decision, but reserve the right to reassert those grounds if *Westside Mothers* holds up on appeal.[1]

## II.

The defendants challenge the standing of the plaintiffs to bring this suit, arguing that the Markvas have lost their standing because they and Matthew have become eligible for additional public welfare benefits which exceed the spend down shortfall and eliminate their injury in fact. The defendants also claim that Ms. Langsdon never acquired standing because, as of the date of filing defendants' second motion for summary judgment, she had not yet qualified for Medicaid.

Federal courts are empowered to adjudicate only "cases" and "controver-

sies." U.S. Const. art. III, § 2. This limitation is commonly enforced through the doctrine of standing, which requires that plaintiffs have a "concrete private interest in the outcome of the suit." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To possess standing, a plaintiff seeking an injunction must show that (1) she has suffered an "injury-in-fact" that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the conduct of the defendants; and (3) the requested relief would likely redress the injury suffered. *Friends of the Earth, Inc. v. Laidlaw Env. Servs.,* 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *National Rifle Assoc. of America v. Magaw,* 132 F.3d 272, 279 (6th Cir.1997). The denial of Medicaid benefits to which an applicant would otherwise be entitled is a cognizable injury for standing purposes. *Hazard v. Shalala,* 44 F.3d 399, 403 (6th Cir.1995).

In response to the defendants' standing arguments, the plaintiffs have filed a Declaration by their attorney that Ms. Langsdon has filed an application with the Family Independence Program, along with a copy of that application, and that Ms. Langsdon's income has not changed since the application was filed. Further, the defendants filed a Reply Brief on July 20, 2001 in which they conceded Ms. Langsdon's Medicaid application had been granted as of July 2001, subject to a monthly spend down amount of $598, as previously calculated. However, Ms. Langdon's grandson, Christopher, receives $330 per month in Social Security survivor's benefits. Consequently, Ms. Langdon is in the

---

1. "The stipulation reads:

"1. Defendants are *not* presently raising the arguments decided in *Westside Mothers v. Haveman* for decision by this court.
"2. The parties respectfully request that the court proceed forward to consider

and decide the issues raised thus far by the parties in this case.
"3. The parties understand and agree that the Defendant may raise in the present case the issues decided in *Westside Mothers,* in the event that the decision in *Westside Mothers* is upheld on appeal."

same position as the Markvas (Matthew Markva is receiving FIP cash assistance) with respect to the defendants' argument that she suffers no injury in fact because other social welfare benefits in the household make up the difference between parent and non-parent caretaker calculations.

█ There are concrete financial differences between being treated as a parent caretaker and a non-parent caretaker under the formulas currently used by the Michigan FIA. Under the non-parent caretaker formula used by the defendants, the Markvas' spend down amount is $280 higher than it would be under the parent caretaker formula. Similarly, Beverly Langsdon's spend down amount is $241 higher than it would be if her benefits were calculated under the parent caretaker formula. This denial of benefits is a concrete injury that is cognizable for standing purposes. *See Hazard,* 44 F.3d at 403.

█ The defendants, claiming that both the Markvas and Ms. Langsdon have lost their standing, urge the Court to consider the public welfare benefits received by the dependent children in their households as the plaintiffs' own, separate benefits. Those funds, however, come into the household for the benefit of the grandchildren, not the plaintiffs. It is the plaintiffs who claim the injury in fact. The defendants have cited no authority to suggest that the Court may or should look to a collateral source when determining whether a party has suffered an injury in fact. There is, however, authority that suggests the contrary result. *See, e.g., Town of*

*East Troy v. Soo Line R.R. Co.,* 653 F.2d 1123, 1132 (7th Cir.1980).

█ Despite the fact that the grandchildren's social welfare payments are not the grandparents' money, the defendants would have the Court effectively impute that income to the grandparents. However, there is no good reason to do that. In determining benefit eligibility, the defendants may not impute income to an applicant unless the income comes from the applicant's spouse or parent. *See* 42 U.S.C. § 1396a(a)(17)(D). More importantly, however, that practice is contrary to sound policy. Parents and caretakers are expected to take care of their dependent children; children, however, are not expected to take care of their grandparents. The funds in question, especially in the case of Christopher Langsdon, are in the names of the children, not the grandparents. The fact that the children's income *can* be used to offset some of the spend down benefit does not mean that it should, nor does it reduce the economic injury to the Markvas and Beverly Langsdon in the first instance.

Defendants have not framed their standing arguments in terms of "injury-in-fact" or "redressability." However, the Court finds that the Markvas, Ms. Langsdon, and Ms. Otler are suffering and will continue to suffer concrete monetary injury, that this injury is directly traceable to the spend down amounts they are forced to meet as non-parent caretakers, and that the injury would likely be redressed by calculating their benefits using the current parent caretaker formula.[2] The Court

---

**2.** A Sixth Circuit panel recently found that standing was no longer was required past the filing of the complaint, and that mootness was the only relevant inquiry. *See Cleveland Branch, NAACP v. City of Parma, OH,* 263 F.3d 513, 525–526 (6th Cir.2001). The distinction is immaterial in this case, because the concept of mootness here functions as little

more than a subset of the standing doctrine's redressability requirement. *See Southwest Williamson County Cmty. Assoc. v. Slater,* 243 F.3d 270, 276 (6th Cir.2001) ("The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.")

concludes, therefore, that the plaintiffs currently have standing to press their claims, and the Court will deny the defendants' Second Motion for Summary Judgment on that ground.

### III.

■ The plaintiffs have moved for a preliminary injunction. The grant of a preliminary injunction is an extraordinary remedy. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.2000). When a party seeks injunctive relief, the Court should consider the following four factors: (1) the likelihood of the party's success on the merits of the claim; (2) whether the injunction will save the party from irreparable injury; (3) the probability that granting the injunction will substantially harm others; and (4) whether the public interest will be served by the injunction. *See Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir.1998), *Six Clinics Holding Corp. v. Cafcomp Systems, Inc.*, 119 F.3d 393, 399 (6th Cir.1997); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985). The district court must make specific findings regarding each of the four factors, unless fewer factors are dispositive of the issue. *See Six Clinics Holding Corp.*, 119 F.3d at 399. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir.2000).

The defendants have moved for dismissal, or in the alternative for summary judgment, claiming that the complaint fails to state a claim for relief, or, in the alternative, that this Court should abstain from adjudicating this suit because there is an alternative procedure for relief within the state's administrative structure. However, the defendants have withdrawn their abstention argument because the state administrative remedy is no longer available to the plaintiffs since they did not request a hearing within 90 days as required by state rules.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. A party opposing a motion for summary judgment must show by affidavits, depositions or other factual material that there is "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251, 106 S.Ct. 2505. "The test is whether the party bearing the burden of proof has presented a jury question as to each element of the case." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000).

■ When there are no material facts in dispute, as in this case, the Court has the discretion to grant summary judgment *sua sponte. Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 104 (6th Cir.1995). As a general rule, the Court is discouraged from doing so without giving advance notice to the parties. *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 571–72 (6th Cir.2001). However, when one party moves for summary judgment, that party is considered to have sufficient notice of the imminence of summary judgment in some form. Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 346 (1998). Thus, when a party has moved for summary judgment, and the Court agrees that there is no genuine dispute of material fact, but believes that judgment as a matter of law is

appropriate for the non-moving party, the Court is free to so declare. *Id.* at 347; *Eckford–El v. Toombs,* 760 F.Supp. 1267, 1272 (W.D.Mich.1991).

There are no material facts in dispute. The plaintiffs have filed a verified complaint concerning the defendants' practices and their own economic circumstances, and the defendants have acknowledged the existence of those facts in their motion papers. The dispute centers around the interpretation of federal social welfare statutes and regulations, and involves only questions of law. Therefore, summary judgment is appropriate.

The determination of the merits of the plaintiffs' claims stated in their complaint necessarily encompasses the issues raised in the defendants' motions to dismiss and for summary judgment. The Court turns now to those issues.

### IV.

■ To establish a claim under 42 U.S.C. § 1983, the plaintiffs must plead and prove two elements: (1) that the defendants acted "under color of law" and (2) that defendants' conduct deprived the plaintiffs of a right, privilege or immunity secured by the Constitution or the laws of the United States. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). There is no contest with respect to the first element. The defendants, purporting to act as the heads of their respective agencies, manage the administration of Medicaid benefits in accordance with federal law, or presumable intend to do so.

As for the second element, the plaintiffs claim that certain provisions within the federal Medicaid statutes confer upon them rights enforceable against state officials concerning the manner in which their Medicaid eligibility and benefit amount is to be determined. Specifically, plaintiffs claim that by not prorating their income to include a "share" for their dependent grandchild, the defendants have failed to "reasonably evaluate" the income available to the non-parent caretaker plaintiffs in violation of 42 U.S.C. § 1396a(a)(17)(B) and (C) (Count 2). The plaintiffs also claim that the defendants violated their rights under 42 U.S.C. § 1396a(a)(10)(C)(i)(III) and 42 C.F.R. § 435.601(d)(4) by failing to use a "comparable methodology" for all individual caretaker relatives whether parent or non-parent. (Count 1). The plaintiffs further argue that by not including a dependent child's share in the proration of their income, but by including such a share in parent caretaker's income prorations, the defendants failed to provide equal "amounts, duration, and scope" of Medicaid coverage to similarly situated caretaker relatives in violation of 42 U.S.C. § 1396a(a)(10)(C)(i)(II) and 42 C.F.R. § 440.240(b)(2). (Count 3). Finally, the plaintiffs argue that by failing to include a share of income for the dependent grandchild in the proration, the defendants have not considered the financial needs of the grandchild, and are thus violating plaintiffs' rights to have their Medicaid eligibility determined under a methodology that is no more restrictive than the July 16, 1996 AFDC methodology which considered the expenses of caring for dependent children when determining the benefit eligibility of non-parent caretakers. They contend that failure by the defendants to employ methodology no more restrictive than that employed in 1996 allegedly violated plaintiffs' rights under 42 U.S.C. § 1396a(a)(10)(C)(i)(III) and 42 C.F.R. § 435.601(d)(2), as modified by 42 U.S.C. § 1396u–1(a). (Count 4).

■ As an initial matter, the Court must determine the status of the defendants' position on the issues they have injected into this case by their reference to

*Westside Mothers,* and their subsequent effort to back away from that decision. That case essentially decided two separate, albeit related, issues. The first issue is whether the Eleventh Amendment bars this suit. Sovereign immunity may be abrogated by Congress in certain circumstances, or it may be waived by a state which consents to suit. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Although affirmative defenses generally must be raised on a timely basis to avoid waiver, sovereign immunity is an affirmative defense which may be asserted at any time, even on appeal. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Henry v. Metro. Sewer Dist.,* 922 F.2d 332, 336 (6th Cir.1990). In this case, the defendants asserted the defense in their second motion for summary judgment, and then withdrew it by stipulation, only to reserve a right to reassert it later if the rest of this suit does not go well for them here and the Court of Appeals lends precedential support to the lower court's *Westside Mothers* decision. The defendants' schizophrenic position on this issue does not constitute a "clear declaration" of the defendants' intention to waive that defense. *See College Sav. Bank,* 527 U.S. at

676, 119 S.Ct. 2219. Consequently, this Court will address it.

The second issue decided by *Westside Mothers* is whether the federal Medicaid statutes which clearly create upon participating states an obligation to include certain features in their public welfare plans also creates a privately-enforceable right or privilege when those obligations are not fulfilled. Because the determination of that issue goes to the heart of the merits of plaintiffs' cause of action under 42 U.S.C. § 1983, this Court is compelled to address that issue as well.

### A.

■ "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const., art. III, § 1. The United States District Court is one of those "inferior courts" established by Congress. Accordingly, the rules of decision to be applied by the district court in deciding cases and controversies include the precedential law established by decisions of the Supreme Court and the United States Court of Appeals. *Jaffree v. Wallace,* 705 F.2d 1526, 1532 (11th Cir.1983), *aff'd* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).[3] For a district court

---

**3.** The Court of Appeals stated:

"Federal district courts and circuit courts are bound to adhere to the controlling decisions of the Supreme Court. *Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982); *Stell v. Savannah–Chatham County Bd. of Educ.,* 333 F.2d 55, 61 (5th Cir.), *cert. denied,* 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); *Booster Lodge No. 405, Int. Ass'n of M. & A.W. v. NLRB,* 459 F.2d 1143, 1150 n. 7 (D.C.Cir. 1972). Justice Rehnquist emphasized the importance of precedent when he observed that 'unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how mis-

guided the judges of those courts may think it to be.' *Davis,* 454 U.S. at 375, 102 S.Ct. 703. *See also, Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (the Supreme Court, in a per curiam decision, recently stated: 'Needless to say, only this Court may overrule one of its precedents.'). The old Fifth Circuit articulated these positions when it stated that 'no inferior federal court may refrain from acting as required by [a Supreme Court's] decision even if such a court should conclude that the Supreme Court erred as to its facts or to the law.' *Stell,* 333 F.2d at 61. Judicial precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and predictability."

sitting in the Eastern District of Michigan, the reported decisions of the United States Court of Appeals for the Sixth Circuit are binding authority upon that district court. *Conrad v. Rofin–Sinar, Inc.*, 762 F.Supp. 167, 172 (E.D.Mich.1991) ("The district courts in this circuit are, of course, bound by a decision of the court of appeals even if they think that decision is egregiously in error.") (citing *Timmreck v. United States*, 577 F.2d 372, 374 n. 6 (6th Cir.1978)).

Neither the Supreme Court nor the Sixth Circuit has imposed a blanket prohibition against suits for declaratory or injunctive relief by private persons against state agencies based on joint federal-state cooperative programs enacted under the Spending Clause, U.S. Const., art. I, § 8 cl. 1, in general, or the Social Security Act, including Title XIX, in particular. To the contrary, the Supreme Court and the Sixth Circuit have held that private parties may enforce rights established by federal Medicaid statutes against state officers in the federal courts pursuant to 42 U.S.C. § 1983. For instance, in *Wilder v. Virginia Hosp. Ass'n, supra*, the Supreme Court held that the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), created rights privately enforceable under § 1983 against state agencies. The Court recognized only two exceptions in which statutory rights are not actionable:

> A plaintiff alleging a violation of a federal statute will be permitted to sue under Section 1983 unless (1) "the statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself."

496 U.S. at 508, 110 S.Ct. 2510 (quoting *Wright v. City of Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). The

Court established a three-part test to determine whether the first exception exists, i.e., whether the statute creates enforceable private rights:

> (1) Was the provision in question intended to benefit the plaintiff?
>
> (2) Does the statutory provision in question create binding obligations on the defendant governmental unit, rather than merely expressing a Congressional preference?
>
> (3) Is the interest the plaintiff asserts specific enough to be enforced judicially, rather than being "vague and amorphous"?

*Id.* at 509, 110 S.Ct. 2510.

The second exception comes into play only where Congress has "provid[ed] a comprehensive enforcement mechanism for protection of a federal right." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). The existence of administrative protection will not itself foreclose private enforcement. "Rather, the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme." *Id.* at 107, 110 S.Ct. 444.

In *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court held that a provision of the Adoption Assistance and Welfare Act of 1980, 42 U.S.C. § 671(a)(15), did not confer a right of action under § 1983. The legislation required that the state's plan include a provision that it must use "reasonable efforts" to maintain abused or neglected children in their own home. However, the Court did not impose a blanket prohibition on federal actions against state agencies. Rather, the Court found that the statute failed the third element of the *Wilder* test

because the statute only imposed an amorphous "generalized duty" upon the state. *Id.* at 363, 112 S.Ct. 1360.

Likewise, in *Audette v. Sullivan,* 19 F.3d 254 (6th Cir.1994), the Court of Appeals for the Sixth Circuit acknowledged that in some circumstances a section within the Medicaid statutory scheme can create an "enforceable right" under § 1983 " 'unless it reflects merely a "Congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit....' " *Id.* at 256 (quoting *Wilder,* 496 U.S. at 509, 110 S.Ct. 2510). In that case, the Court held that the obligation on the state created by 42 U.S.C. § 1396a(c)(1) to provide benefits at a certain payment level was not enforceable in a § 1983 action.

However, the Sixth Circuit found that other portions of the Medicaid statutes were privately enforceable against state officers under § 1983 in *Wood v. Tompkins,* 33 F.3d 600 (6th Cir.1994). The Court there held that the manner of analysis was that prescribed by the Supreme Court in *Wilder. Id.* at 604, 606. And in *Boatman v. Hammons,* 164 F.3d 286 (6th Cir.1998), the Court held that not only federal statutes but also federal regulations can give rise to "rights" that are privately enforceable against state officers under § 1983. *Id.* at 289.

In *Westside Mothers,* the Court indicated that it could detect a sea change in the Supreme Court's philosophical approach to the question of whether joint federal-state statutory programs enacted by Congress under its Spending Clause authority constitutes a "right" under § 1983, and whether violation of such a statute is actionable against the state official in light of the Eleventh Amendment. This Court believes, however, that it is not the office of a federal district court judge to test those waters when circuit and Supreme Court precedent have established

the flow. *See United States v. Faasse,* 265 F.3d 475, 483–84 (6th Cir.2001) ("It is not our practice to decide cases based on a hunch that a decision by the Supreme Court is aspirational.") This Court, therefore, rejects the defendants' argument, to the extent that it has been advanced, that there is a blanket prohibition of such suits under § 1983. The law of the Sixth Circuit requires, however, an examination of each of the statutes upon which plaintiffs rely under the *Wilder* test to determine whether plaintiffs may advance a private cause of action based thereon under § 1983.

### B.

In Counts 1 and 4 of their complaint, plaintiffs contend that the defendants have violated plaintiff's rights under 42 U.S.C. § 1396a(A)(10)(C)(i)(III) and 42 C.F.R. § 435.601(d)(4) by failing to use a "comparable methodology" for all individual caretaker relatives whether parent or non-parent. The statute describes some of the necessary elements required of public welfare plans by participating states, and provides:

> (i) [T]he plan must include a description of ... (III) the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility, which shall be no more restrictive than the methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect, and which shall be no more restrictive than the methodology which would be employed under the appropriate State plan (described in subparagraph (A)(i)) to which such group is most closely categorically related in the case of other groups.

42 U.S.C. § 1396a(a)(10)(C)(i)(III). The corresponding regulation states:

> The less restrictive methodology applied under this section must be comparable for all persons within each category of assistance (aged, or blind, or disabled, or AFDC related) within an eligibility group. For example, if the agency chooses to apply less restrictive income or resource methodology to an eligibility group of aged individuals, it must apply that methodology to all aged individuals within the selected group.

42 C.F.R. § 435.601(d)(4).

The plain language of the statute and the regulation indicates that they were intended to benefit all persons within a specific eligibility group. Plaintiffs claim to be relative caretakers within the group of medically needed individuals. Therefore, the statute in question was intended to benefit the plaintiffs. The statute and regulation also create a mandatory requirement upon the state agency charged with creating the public welfare plans. Finally, the right plaintiffs assert—to be treated equally with others within the eligibility group, specifically caretakers—is specifically enforceable rather than vague and amorphous.

The claim contained in Count 2 of the complaint is that defendants did not "reasonably evaluate" the income available to the plaintiffs in determining their medicaid eligibility and therefore the defendants violated 42 U.S.C. § 1396a(a)(17)(B) and (C). The statutory provisions state:

> (a) [A] State plan for medical assistance must ... (17) ... (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and (in the case of any applicant or recipient who would, except for income and resources, be eligible for aid or assistance in the form of money payments under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV, or to have paid with respect to him supplemental security income benefits under subchapter XVI of this chapter) as would not be disregarded (or set aside for future needs) in determining his eligibility for such aid, assistance, or benefits, (C) provide for reasonable evaluation of any such income or resources....

Once again, the statute by its terms is intended to provide standards upon which individuals applicants can rely in the determination of their benefit eligibility by state officials. It is intended to benefit the plaintiffs, and it is a binding obligation on the state agency. Subsection (C) of this statute does include the term "reasonable evaluation," which is similar to the terminology found to be too generalized by the Supreme Court in *Suter v. Artist M.,* 503 U.S. at 363, 112 S.Ct. 1360. However, in this case that portion of the statute is clarified by the previous section which states that a reasonable evaluation accounts only for the resources available to the applicant himself or herself. 42 U.S.C. § 1396a(a)(17)(B). This language provides guidance to the state in the manner it is to "reasonabl[y] evaluate[ ]" the income available to the applicant and "involve[s] unambiguous directives that are well within the ability of the judiciary to enforce." *Wood,* 33 F.3d at 608.

The claim in Count 3 of the complaint is based on a violation of 42 U.S.C. § 1396a(a)(10)(C)(i)(II), which states:

> (i) [T]he plan must include a description of ... (II) the amount, duration, and scope of medical assistance made available to individuals in the group....

The plaintiffs also claim that the defendants violated a corresponding regulation, 42 C.F.R. § 440.240(b)(2), which states:

(b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group: ... (2) A covered medically needy group.

It is the plaintiffs' theory that by not including a "share" for the minor grandchildren when prorating plaintiffs' income, and prorating parent caretakers' incomes in a manner that does account for such a "share," the defendants failed to provide equal "amount[s], duration, and scope" of Medicaid coverage to similarly situated caretaker relatives. When read together, the statute and the regulation require the state agency to include in its plan provisions ensuring the equality of benefits for similarly-situated applicants. This Court concludes that the purpose of the statute is intended to benefit applicants, such as the plaintiffs, by ensuring equal treatment and prohibiting distinctions in the amount of benefits based on factors which Congress deems irrelevant. The language of the statute ("the plan must ...") is mandatory. The command of the statute and regulation is specific—that services to all medically needy individuals be equal in amount, duration and scope—and readily enforceable by the judiciary.

 The Court concludes that the statutes upon which the plaintiffs rely in this case create "right[s] ... secured by ... the laws of the United States," and, therefore, the plaintiffs may bring their claims for declaratory and prospective injunctive relief pursuant to 42 U.S.C. § 1983 against the directors of the state agencies charged with the administration of the joint federal-state Medicaid program based thereon.

### V.

Turning to the merits of plaintiffs' specific claims, the crux of plaintiffs' argument is that non-parent relative caretaker Medicaid applicants are treated differently than parent relative caretakers, and the FIA is prohibited from making that distinction. The claims turn on whether the FIA is employing a *less* restrictive methodology now than was used in 1996 for parent caretakers, and if so, whether "comparable" methodologies are indeed being employed by the FIA when calculating benefits for all individuals in the caretaker relative group (Count 1); whether the defendants failed to "reasonably evaluate" the plaintiffs' available resources when calculating their spend down amounts (Count 2); whether Medicaid coverage of equal amount, duration and scope has been provided to all individuals in the caretaker relative group (Count 3); and whether the defendant are employing a *more* restrictive methodology for grandparents in 1999 than in 1996 to determine their benefit eligibility and amount (Count 4).

The defendants argue that another provision of the federal Medicaid statutory scheme prevents the state agency from treating non-parent caretakers the same as parent caretakers in determining a child's eligibility for Medicaid in the medically needy group. The defendants observe that 42 U.S.C. § 1396a(a)(17)(D) allows the state agency to impute a parent's income to a child-applicant for purposes of determining Medicaid eligibility in the medically needy group, but prohibits the state agency from imputing a grandparent's income to the child for the same purpose. The statutory provision reads:

(D) [D]o not take into account the financial responsibility of any individual for any applicant or recipient of assistance under the plan unless such applicant or recipient is such individual's spouse or such individual's child who is under age 21 or (with respect to States eligible to participate in the State program established under subchapter XVI of this chapter), is blind or permanently and

totally disabled, or is blind or disabled as defined in section 1382c of this title (with respect to States which are not eligible to participate in such program); and provide for flexibility in the application of such standards with respect to income by taking into account, except to the extent prescribed by the Secretary, the costs (whether in the form of insurance premiums, payments made to the State under section 1396b(f)(2)(B) of this title, or otherwise and regardless of whether such costs are reimbursed under another public program of the State or political subdivision thereof) incurred for medical care or for any other type of remedial care recognized under State law.

42 U.S.C. § 1396a(a)(17)(D). A corresponding regulation provides:

(a) *Basic requirements.* Subject to the provisions of paragraphs (b) and (c)[ [4]] of this section, in determining financial responsibility of relatives and other persons for individuals under Medicaid, the agency must apply the following requirements and methodologies: (1) except for a spouse of an individual or a parent for a child who is under age 21 or blind or disabled, the agency must not consider income and resources of any relative as available to an individual.

42 C.F.R. § 435.602(a)(1). The defendants argue that the anti-deeming provisions in the statute and regulation prevent state agencies from treating as available the income or resources of anyone except an applicant's spouse or parent in determining eligibility and amount of the benefits for applicants in the medically needy group. Since the grandparents' income may not be attributed to the child when determining the benefit eligibility of the child, a fact not contested by the plaintiffs, the defendants contend that the "reverse" must also apply and the grandparents may not have their spend down decreased by excluding from income those expenses for the support of their grandchildren.

The defendants argue that the effect of the statutory scheme is that a child who is living with a *non-parent* caretaker may receive a higher amount of individual Medicaid assistance under children's Medicaid than a child living with *parent* caretakers since the *parent* caretakers' income is deemed "available" to the child and therefore reduces the child's benefits. However, the *non-parent* caretakers' income must *not* be deemed "available" to the child, so less available resources are considered and the child in turn is eligible to receive more aid. The *non-parent* caretaker, therefore, should not be entitled to pay a lower spend down amount for her personal Medicaid benefits due to her support of a child; the child already receives more children's Medicaid assistance due to income not being imputed from the child's caretaker in that case.

The current system, the defendants contend, modified in 1999, is not *less* restrictive for parent caretakers than the system utilized in July 1996 for parent caretakers in the categorically needy group, that is,

---

4. "(b) *Requirements for States using more restrictive requirements.* Subject to the provisions of paragraph (c) of this section, in determining financial eligibility of aged, blind, or disabled individuals in States that apply eligibility requirements more restrictive than those used under SSI, the agency must apply: (1) The requirements and methodologies for financial responsibility of relatives used under the SSI program; or (2) More extensive requirements for relative responsibility than specified in § 435.602(a) but no more extensive than the requirements under the Medicaid plan in effect on January 1, 1972.

"(c) *Use of less restrictive methodologies.* The agency may apply income and resources methodologies that are less restrictive than those under the cash assistance programs as specified in State Medicaid plan in accordance with § 435.601(d)."

under AFDC programs. Both in 1996 and at present, the parents' income is imputed to the child when benefits for the child are calculated. Defendants, however, acknowledge that the new 1999 proration methodology made some persons eligible that would not have been eligible under pre 1999 policy. However, the defendants assert that the change was instituted in order to more fairly comply with the "availability" requirement.

In addition, the defendants argue that the current system is not *more* restrictive to non-parent caretakers than that applied under AFDC to the same group. Under the 1996 methodology, the grandparents' income, at their option, was considered "available" to those in the "assistance unit." Just as non-parent caretakers are not eligible today for lower spend down amounts resulting from their support of grandchildren, the defendants argue that under the 1996 policy there were no deductions from a non-parent caretakers' income to recognize the support that he or she provided to grandchildren in or out of the unit. In other words, in 1996 the grandparents' income could be counted when calculating the income of the unit, but the grandparent did not receive a specific deduction for support of a grandchild which could have resulted in "more" benefits apportioned to the group on behalf of the grandparent.

## A.

The defendants contend that it would be inequitable and violative of federal law to treat other relative caretakers the same as parent caretakers for the purpose of calculating their own benefit eligibility and amount because the children of those respective caretakers have their eligibility and benefit amount calculated differently. The plaintiffs contend that treating parent and non-parent relative caretakers differently violates federal law.

The Medicaid program covers medical costs incurred by needy individuals in dozens of different eligibility groups. *See, e.g.,* 42 U.S.C. §§ 1396a(a)(10)(A) (categorically needy individuals, S.S.I. recipients, and others); 1396a(a)(10)(C)(ii) (certain minor children and pregnant women); 1396a(e) (certain families and newborn children); 1396a(*l*)(2)(A) & (4)(A) (certain infants, children and pregnant women below the poverty line); 1396d(a) (certain children, elderly, pregnant women, and individuals suffering from disabilities); 1396r 6(a) (eligibility as a result of certain extensions of benefits); 1396u–1(b) (certain individuals qualifying for assistance under plans in effect prior to June 16, 1996). It is uncontested that the plaintiffs in this care are in the Caretaker Relative Medicaid eligibility group defined by 42 U.S.C. § 1396d(a)(ii). Parents and grandparents are both members of that group. *See* 42 U.S.C. § 606(a) (1995).

The methodology to be used for determining eligibility for Medicaid groups is statutorily tied to the methodology for determining eligibility for assistance under Title IV A of the Social Security Act for the corresponding group. *See* 42 U.S.C. § 1396a(a)(10)(C)(i)(III) and 42 C.F.R. § 435.601(b). In Michigan, the cash assistance for needy families program had been known as "Aid to Families with Dependent Children" (AFDC) as it was in effect on July 16, 1996. After that date, i.e., following passage of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. 104–193 (the Federal Welfare Reform Act), Michigan's new plan became known as the "Family Independence Program" (FIP). Federal law permits a state plan to be less restrictive (but not more restrictive) in granting Medicaid benefits than for corresponding cash assistance programs. 42 U.S.C. § 1396a(a)(10)(C)(i)(III). However, if a methodology less restrictive than the one

used for determining eligibility for the related cash assistance program group in effect on July 16, 1996 is used, that methodology must be "comparable" for all applicants within a category in the group. 42 C.F.R. § 435.601(d)(4).[5]

The defendants argue that the comparability requirement of the statute and regulation does not apply because the current methodology is not less restrictive than the July 1996 methodology. One methodology is "less restrictive" than another if more people become eligible for benefits, or the same people receive benefits to a greater degree, than under the other methodology. *See* 42 C.F.R. § 435.601(d)(3). The methodology may be less restrictive either because more of an applicant's income is disregarded under that methodology, or because more of an applicant's income is protected and reserved for his or her non-medical needs. *See Calkins v. Blum*, 511 F.Supp. 1073, 1090–91 (N.D.N.Y.1981).

 In this case, the defendants acknowledge that they changed the methodology for determining Medicaid eligibility for parent caretakers in 1999. According to the Michigan Department of Community Health employee who drafted the policy, it was not the department's intent to make the new methodology less restrictive. Affidavit of Robert Stampfly ¶ 6. However, the methodology in effect before July 1996 assumes that all (100%) of a parent's income was available to meet the needs of each child. Defendants acknowledge that the 1999 revision apportioned a parents' income among the spouse and children supported by that parent. Defendants claim this change was mandated by 42 U.S.C. § 1396a(a)(17)(B) which requires that eligibility be determined solely on the basis of a person's countable income. But the defendants admit that, regardless of their intent, the change made some applicants eligible who would have been ineligible under the pre 1999 methodology, since income deemed available to a child for the purpose of assessing the child's eligibility for benefits is deemed *unavailable* to the parent when assessing the parent's own eligibility for benefits. The conclusion is inescapable, therefore, that the 1999 methodology is less restrictive to parent-applicants.

The defendants' argument that the "anti-deeming" statute, 42 U.S.C. § 1396a(a)(17)(D), and the corresponding regulation, 42 C.F.R. § 435.602(1), prohibit them from prorating grandparents' income to account for a share for a dependent grandchild is based on an assumption that the defendants *must* utilize a *quid pro quo* approach within the family unit. The defendants have cited no authority which supports their claim that they must adopt such an approach. Although it may be reasonable to treat income that is "unavailable" to one person within a family unit as being "available" to another person in that unit, the federal Medicaid statutes and regulations do not compel such symmetry. To the contrary, the statutory provisions noted above *require* the state agency to treat parent and non-parent caretaker applicants comparably, but they prohibit the state agency from treating the respective children in their care the same way.

There are many reasons why this distinction might be justified. For instance, it may be that older caretakers such as grandparents could have a greater need for medical care than younger caretakers such as parents. The difference in approaches might also reflect the fact that non-parent relative caretakers have no legal obligation to support the dependent child, and it is necessary to avoid a disincentive to those non-parents who might

---

**5.** Although Title IV–A no longer exists, federal law requires reference to the superceded statutes and regulations. *See* 42 U.S.C. § 1396u–1(a).

question the ability to take in the child and provide for their own needs as well. The Court need not discern the rationale behind Congressional policy, however, because the outcome is clearly reflected in the applicable statutes, to the extent that anything within the federal social welfare legislation can be deemed "clear." *See In re Madeline Marie Nursing Homes,* 694 F.2d 433, 440 (6th Cir.1982) (" 'The Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction, as Judge Friendly has observed, makes the Act almost unintelligible to the uninitiated.' " [quoting *Schweiker v. Gray Panthers,* 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981) ] ).

The defendants' methodology used for determining non-parent relative caretaker eligibility and benefit amount thus violates the requirement that the state agency must establish a "single standard to be employed in determining income and resource eligibility" for each eligibility group, 42 U.S.C. § 1396a(a)(10)(C)(III), and that such methodology "be comparable for all persons within [the] category of assistance ... within [the relative caretaker] eligibility group." 42 C.F.R. § 435.601(d)(4). Plaintiffs shall prevail on the claim stated in Count 1 of their complaint.

### B.

For many of the same reasons stated in the previous section, the methodology used by the defendants to determine non-parent relative caretaker eligibility for Medicaid in the medically needy category violates 42 U.S.C. § 1396a(a)(10)(C)(i)(II) and 42 C.F.R. § 440.240(b)(2) because the services within the caretaker relative medically needy group are not "equal in amount, duration and scope for all recipients within the group." *Id.* The defendants use different methodologies for parents and non-parents in determining each one's benefit eligibility and amount. In this case, the different methodologies result in non-par-

ent caretakers being burdened with significantly higher spend down amounts than parent caretakers. The above-cited statute and regulation prohibit this practice. *See Blanchard v. Forrest,* 71 F.3d 1163, 1167 (5th Cir.1996). Plaintiffs are therefore entitled to relief under Count 3 of their complaint.

### C.

■ In Count 2 of the complaint, plaintiffs allege that the methodology used to determine their eligibility violates 42 U.S.C. § 1396a(a)(17), which requires the defendants to reasonably evaluate an applicant's resources and consider "only such income and resources" that are "available to the applicant." *Id.* The Court disagrees. There is no provision within the Medicaid statutes or regulations which prohibits the state agency from evaluating household income and utilizing a *quid pro quo* approach within the family unit. Such an approach is not unreasonable *per se,* and may be utilized unless it runs afoul of a specific statutory or regulatory prohibition, such as 42 C.F.R. § 435.602(1).

The plaintiffs have cited several district court decisions which are helpful in defining the terminology, such as "reasonable evaluation," but they do not furnish any guidance relating to the specific issue now before the Court. Nonetheless, it is useful to note that in *Harris v. Lukhard,* 547 F.Supp. 1015, 1023 (W.D.Va.1982), the Court held that "reasonable evaluation" using "reasonable standards" requires both accuracy and simplicity so that the plan drafter "will strike a balance between administrative simplicity and the accurate appraisal of resources." *Id.* In *Golis v. Rubin,* 857 F.Supp. 1407, 1415 (D.Haw. 1994), the Court reasserted that the reasonable evaluation process "assures that the State will not assign artificially high values to either resources or income in

order to eliminate truly needy persons from the welfare program." And in *Wilczynski v. Harder*, 323 F.Supp. 509, 517 (D.Conn.1971), the Court noted that assets and income are assigned artificially high values unless there is some "reference to evaluation for purposes of meeting those present needs for which assistance would otherwise be provided."

The methodology which calls for evaluation of the income and resources of a family unit, whether those resources come from the private sector or from public welfare programs, and excluding or including in the formula expenses for a particular individual within the unit depending on whether that individual's income is also added or excluded from the unit's resource pool, is not an inherently unreasonable methodology, nor does it necessarily result in over-evaluating income and resources. Although there are specific prohibitions against applying such an approach in this particular case, as the Court has noted above, the approach itself is not so unreasonable as to violate 42 U.S.C. § 1396a(a)(17)(B) or (C). Count 2 of the complaint, therefore, will be dismissed.

### D.

The plaintiffs' claim in Count 4 is based on the premise that the state agency's 1999 methodology which is used to determine Medicaid eligibility and amount for non-parent relative caretakers must not be more restrictive than the methodology used to determine eligibility for the most closely related categorically needy group. 42 U.S.C. § 1396a(a)(10)(C)(i)(III) ("[T]he methodology ... shall be no more restrictive than [that] which would be employed under the appropriate State plan ... to which such group is most closely related....") The parties agree that the state plan for categorically needy applicants to which the medically needy eligibility plan

must be compared is the state program in effect on July 16, 1996 under Title IV–A of the Social Security Act, *i.e.*, the AFDC program, which has since been superceded.[6] This claim is different from the one advanced in Count 1, because while the Count 1 claim requires a comparison of the treatment of *parent* caretaker applicants now with pre-July 1996 parent applicants to determine whether the current methodology is *less* restrictive, Count 4 requires the Court to compare *non-parent* caretaker applicants now with pre-July 1996 non-parent applicants to determine whether the current methodology is *more* restrictive.

The defendants acknowledge that the July 1996 AFDC methodology for categorically needy applicants called for an assessment of the needs of all the people in the household unit, including children, but also accounted for the resources contributed by everyone in the household. As defendants put it, under the 1996 AFDC methodology, "each person's needs were everyone's responsibility." Defendants' Post Hearing Br. at 1. The defendants also acknowledge that the same approach is *not* used today with respect to non-parent relative caretakers. As noted above, the defendants contend that the new methodology was necessitated by the anti-deeming statute and regulation, 42 U.S.C. § 1396a(a)(17)(D) and 42 C.F.R. § 435.602(a)(1).

The effect of the 1999 methodology, however, is that non-parent caretakers, such as the plaintiffs in this case, are not permitted to disregard or protect income which is used to care for the needs of the dependent child(ren) in their care. Whereas under the July 1996 AFDC methodology, the larger group size (increased by including dependent children) increased

---

6. See footnote 3, *supra*.

both the need standard and the payment standard, the smaller group size for current non-parent caretaker applicants protects less income and results in fewer benefits due to the higher spend down amount that results. Although children applicants for assistance in such households may be better off under the 1999 methodology because non-parent income cannot be deemed available to them, those that care for them, such as the plaintiffs in this case, do not fare as well. Accordingly, the 1999 methodology is more restrictive to non-parent relative caretaker Medicaid applicants in the medically needy category than for non-parent relative caretakers under the 1996 AFDC methodology. Plaintiffs, therefore, have established a violation of 42 U.S.C. § 1396a(a)(10)(C)(i)(III) and 42 C.F.R. § 435.601(d)(2), and will prevail on Count 4 of their complaint.

### VI.

■ Although the plaintiffs moved for a preliminary injunction, the Court has determined the merits of the claims and will proceed to judgment, wherein plaintiff seeks permanent injunctive relief. Once the merits of the claims are determined, for a permanent injunction the moving party need show only (1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998). Other factors are relevant, as well, such as the probability that granting the injunction will substantially harm others, and whether the public interest will be served by the injunction. *See Rock and Roll Hall of Fame*, 134 F.3d at 753. The Court will address each of these factors in turn.

### A.

Plaintiffs assert that the harm that would be suffered by the plaintiffs if an injunction is not issued is the loss or delay

of Medicaid assistance. Loss or delay of sufficient medical care, they argue, will complicate the "chronic illnesses" of the plaintiffs causing long-term health problems or death. Mrs. Markva requires blood work associated with her past thyroid cancer, and also requires treatment for foot problems. Mr. Markva was diagnosed with hypertension.

Other courts have held that delay or denial of Medicaid benefits can amount to irreparable harm. For instance, in *Malloy v. Eichler*, 628 F.Supp. 582 (D.Del.1986), the court held that a preliminary injunction compelling the grant of Medicaid benefits was warranted. The court stated, "Plaintiffs are, in all likelihood, categorically entitled to free medical care" and "[i]f [Malloy's] severe asthma attack has caused permanent damage to his health, no order of this Court can restore what has been lost. Should a future attack cause either similar damage or a loss of life, this Court would be equally powerless to remedy the devastation." *Id.* at 598. The court further held that the plaintiff's access to a charitable medical clinic did not sufficiently remove the risk of harm in that services were limited and the clinic was not precluded from asking for reimbursement. *Id.* at 599.

In *Daniels v. Wadley*, 926 F.Supp. 1305 (M.D.Tenn.1996), plaintiffs challenged a consent decree whereby the State of Tennessee took too long to resolve claims for Medicaid coverage submitted by individuals already enrolled in the state Medicaid program. *Id.* at 1310–11. The court granted injunctive relief to prevent the enrollees, who had limited financial resources, from "forego[ing] the contested medical treatment and [ ] suffer[ing] substantial physical harm as a result." *Id.* at 1312.

Finally, in *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749 (1st

Cir.1983), plaintiffs were families with stepchildren who had Medicaid benefits terminated as a result of a newly added stepparent liability provision that required stepparent income to be included in a stepchild's eligibility determination in the AFDC program. Although no longer automatically eligible for Medicaid as AFDC recipients, plaintiffs claimed that the state had to redetermine their eligibility under an alternate category prior to termination. The court granted injunctive relief reinstating Medicaid benefits concluding that case law and statutory construction indicated that "any procedural protections that ensure continuity in benefits should be accorded to the categorically needy." *Id.* at 753. Since the statutes prohibited the termination of benefits until eligibility of current recipients was reassessed, the court held that injunctive relief was appropriate considering that "[t]ermination of benefits that causes individuals to forego such necessary medical care is clearly irreparable injury." *Id.* at 753.

██ Although the preceding cases are distinguishable from the current case in a variety of ways, they establish the principle that denial or delay in benefits which effectively prevents plaintiffs from obtaining needed medical care constitutes irreparable harm. In other words, risk of further injury to health warrants injunctive relief.

### B.

██ A party seeking an injunction has an adequate remedy at law if the harm she seeks to avoid or prevent can be sufficiently redressed by an award of damages. There is no adequate remedy at law for individuals suing a state in federal court because the Eleventh Amendment bars the award of damages. *Temple Univ. v. White,* 941 F.2d 201, 215 (3d Cir.1991); *Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social & Rehabilitation Servs.,* 31 F.3d 1536, 1543 (10th Cir.1994).

### C.

██ On the question of whether an injunction will substantially harm others, the plaintiffs argue that the defendants' obligation to provide Medicaid assistance to other needy Michigan residents in conformity with federal law would be unaffected by an order compelling defendants to treat all relative caretakers the same. The defendants, on the other hand, repeat their argument that the anti-deeming statute would affect the eligibility of the grandchildren, and would constitute injury to a third party. In essence, defendants argue that if plaintiffs have their eligibility assessed like parent caretakers, then plaintiffs' income would in turn be deemed to the grandchild. The grandchildren's Medicaid eligibility would therefore be adversely affected due to the availability of supplemental resources. This argument fails because 42 U.S.C. § 1396a(17)(D) prevents that result.

Defendants also argue that if the Court granted the requested relief which would in effect expand Medicaid eligibility of nonparent relative caretakers, the public funds available to pay for benefits for individuals "more indigent" than the plaintiffs would be reduced, thus harming those more indigent individuals. This argument presumes that Medicaid funds for medically and categorically needy individuals are exhausted annually, which is not established on this record. The immediate harm to the plaintiffs, however, is more evident and less speculative than the possible, indirect harm to third parties suggested by the defendants. More importantly, the Court has found that the defendants' present procedure violates federal law and the defendants must expend the resources necessary to comply with the statutory mandate or risk losing a greater amount of funding. *See Harris v. McRae,* 448 U.S. at 301, 100 S.Ct. 2671.

## D.

The holding in *Malloy,* 628 F.Supp. at 599 provides concise guidance on the question of whether issuance of a preliminary injunction will serve the public interest. In *Malloy,* the defendants contended that plaintiffs were *undeserving* of the benefits, and therefore, the public would be harmed since funds exhausted on such plaintiffs were generally not recoverable; plaintiffs claimed that the public was served when needy applicants *deserving* of benefits received assistance. The court observed that "[e]ach argument is correct if its premise is accepted...." *Id.* at 599. The issue was whether plaintiffs were deserving of the benefits. Since the court determined that plaintiffs would likely succeed on the merits as "deserving" applicants, the public interest was served. Therefore, in the case at hand, balancing of this factor pivots on the Court's determination of whether plaintiffs indeed qualify as needy non-parent caretaker relatives eligible for the same consideration received by needy parent caretakers. The Court finds that the public interest will be served by issuing an injunction to so require.

## VII.

In light of the affidavits, documentary evidence and verified statements submitted by counsel, dismissal under 12(b)(6) and summary judgment are not appropriate. Based on a review of the Medicaid statutes and the implementing regulations, the Court finds that 42 U.S.C. § 1396a(a)(17)(D) does not bar the defendants from excluding income expended to support the plaintiffs' grandchild when determining the benefit eligibility of the plaintiffs. Furthermore, injunctive relief is appropriate for the reasons stated above.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss or for summary judgment [dkt # 9] is **GRANTED IN PART AND DENIED IN PART,** and Count 2 of the complaint is dismissed.

It is further **ORDERED** that summary judgment in favor of the plaintiffs is **GRANTED** as to the claims stated in Counts 1, 3 and 4 of the Second Amended Complaint.

It is further ordered that plaintiffs' motion for a preliminary injunction [dkt # 4] is **DENIED** as moot.

It is further **ORDERED** that the defendants' second motion for summary judgment [dkt # 25] is **DENIED.**